**UNITED STATES of America,**

v.

**Stephen SACCOCCIA, Donna Saccoccia, Anthony DeMarco, Vincent Hurley, James Saccoccio, Kenneth Saccoccio, Stanley Cerilla, Stephen Pizzo, Carlo DeMarco.**

**No. CRIM. A. 91–115–T.**

United States District Court, D. Rhode Island.

July 31, 2001.

James Leavey, AUSA, Michael Iannotti, AUSA, U.S. Attorney's Office, Providence, RI, for plaintiff.

Robert E. Craven, Michael J. Lepizzera, Jr., Providence, RI, for defendants.

## Decision

TORRES, Chief Judge.

The United States (the government) has moved to compel several attorneys to turn over money and other property received as attorneys' fees from Stephen and Donna Saccoccia who were convicted of violating 18 U.S.C. § 1962(d), the RICO conspiracy statute.

For the reasons hereinafter stated, that motion is granted, in part, and denied, in part.

## Background

On November 19, 1991, Stephen Saccoccia (Stephen), Donna Saccoccia (Donna) and others were indicted for a variety of offenses stemming from their alleged laundering of nearly $140 million derived from drug trafficking. Because one of the offenses charged was a RICO conspiracy (18 U.S.C. § 1962(d)), the indictment contained a count seeking forfeiture of the $140 million, pursuant to the provisions of 18 U.S.C. § 1963(a), or forfeiture of any "substitute assets" owned by the defendants, pursuant to the provisions of § 1963(m).

Four days after the indictment was returned, Judge Boyle entered an *ex parte* "Protective Order," pursuant to 18 U.S.C. § 1963(d). That order enjoined the defendants from transferring specifically described property and "$140 million in U.S. currency for which the defendants are jointly and severally liable."

At trial, Donna was represented by attorney Lawrence Semenza and Stephen was represented by attorneys Jack Hill and Kenneth O'Donnell. Attorney Stephen Finta represented Stephen in connection with money laundering charges, then pending against him in the Central District of California.

Donna was convicted in December 1992, and Stephen was convicted in March 1993. Both Saccoccias were sentenced to lengthy prison terms. In addition, pursuant to 18 U.S.C. § 1963(a)(3) and (e), they were ordered to forfeit the amount of $136,344,231.86 that was determined to be the "proceeds" of the conspiracy. *See U.S. v. Saccoccia,* 823 F.Supp. 994 (D.R.I.1993). The convictions and forfeiture judgments were affirmed on appeal. *U.S. v. Hurley,* 63 F.3d 1 (1st Cir.1995); *U.S. v. Saccoccia,* 58 F.3d 754 (1st Cir.1995). Since that time, there have been numerous proceedings involving the government's efforts to execute on the forfeiture judgment.

In the motion to compel now before the Court, the government seeks to require attorneys engaged by the Saccoccias at various stages of this case to turn over money paid to them as counsel fees. The government argues that the fees are forfeitable under § 1963(c), which provides for forfeiture of the "proceeds" of a RICO conspiracy that have been transferred by a defendant to another person; or, under § 1963(m), which makes other property owned by a defendant forfeitable as "substitute assets" when the "proceeds" cannot be located. Alternatively, the government argues that, even if the fees are not forfeitable under § 1963(c) or (m), they are forfeitable because they were transferred in violation of Judge Boyle's Protective Order.

Attorneys Hill, O'Donnell, and Semenza argue that the government is estopped from seeking forfeiture of the fees paid to them because they agreed to represent the Saccoccias in reliance upon what they allege were assurances by the government that it would not seek forfeiture of their fees. Finta claims that those statements were communicated to him by O'Donnell

and that he, too, relied on them. All of the attorneys also dispute the contention that the fees paid to them are forfeitable on any of the grounds advanced by the government.

### Facts

This Court conducted an evidentiary hearing to resolve the factual issues raised by the government's motion. After listening to the testimony of the witnesses, observing their demeanor and reviewing the exhibits presented by the parties, the Court hereby finds the relevant facts to be as follows.

### I. The Discussions Among Counsel

In early 1992, shortly after the Saccoccias were indicted, Hill and Semenza met with AUSA's James Leavey and Michael Davitt to inquire about the policy of the United States Attorney's Office in the District of Rhode Island regarding forfeiture of attorney's fees. Leavey told them that the office had never sought to forfeit reasonable fees paid to attorneys.

A couple of weeks later, Hill and Semenza again met with Leavey to discuss the possibility of a plea agreement pursuant to which Stephen would cooperate with the government. Hill expressed concern that the government might require Stephen to forfeit all of his assets. Leavey confirmed that the government would insist upon the forfeiture of Stephen's assets, but stated that if the parties reached agreement on the terms, Leavey would include, in the written plea agreement, a provision that the government would not seek forfeiture of any reasonable attorneys' fees paid to Hill and Semenza, and that he would seek the U.S. Attorney's approval of that provision.

In the fall of 1992, shortly before Donna was convicted, O'Donnell told Leavey that he, too, might represent Stephen and he inquired about the government's policy regarding the forfeiture of attorneys' fees. Leavey repeated to O'Donnell that the U.S. Attorney's Office in Rhode Island had never sought to forfeit reasonable attorneys' fees. Finta never spoke to Leavey and never entered an appearance in this case, but Leavey's statements were communicated to him by O'Donnell.

In 1996, long after Stephen and Donna had been convicted, the government began taking the depositions of the Saccoccias' attorneys in an attempt to locate the Saccoccias' assets. When several attorneys expressed their belief that the government had agreed not to seek forfeiture of their fees, Leavey sent a letter to all of them disclaiming any such agreement.

Upon receipt of the letter, Hill and O'Donnell each called Leavey to protest. During his conversation with Leavey, Hill acknowledged knowing that agreements not to forfeit attorneys' fees required approval by the Department of Justice. During the conversation between O'Donnell and Leavey, Leavey stated that, because the U.S. Attorney's Office believed that this Court had asked O'Donnell to represent Stephen,[1] it would not seek to forfeit O'Donnell's fees, unless the Attorney General directed them to do so.

### II. The Fees

The fees at issue in this case were paid between March 24, 1992, a date approximately four months after the indictment was returned and the Protective Order was entered, and February 23, 1995, a date approximately two years after Stephen was convicted. The method of payment and the circumstances surrounding each payment varied considerably.

---

1. That belief was erroneous. O'Donnell was retained by Stephen.

Between the time Stephen was indicted and the time just after he was convicted, Hill received a total of $504,985 in fees. All but $25,000 was paid in the form of checks or wire transfers sent by a Swiss attorney named Valentin Landman. The amounts ranged from $20,000 to $229,985. The remaining $25,000 was delivered, in cash, to O'Donnell's office. Two hundred fifty thousand dollars of these fees were received before Stephen was convicted. The remaining $254,985 was received on March 25, 1993, shortly after Stephen's conviction.

During that same period, Semenza received a total of $331,500 for representing Donna Saccoccia. All of that money, apparently, was received before the Saccoccias were convicted.

Between January 1993 and April 1993, O'Donnell received approximately $410,000. One hundred twenty-five thousand dollars of that amount was delivered anonymously to his office in cash installments ranging from $25,000 to $50,000. O'Donnell retained, as payment for his fees, only $107,500 of the $410,000 that he received. The remainder was given to him for delivery to various attorneys who were representing the Saccoccias and to other individuals. Sixty-five thousand dollars of O'Donnell's fees were paid before Stephen was convicted.

Between October 1992 and February 1994, Finta received $469,200. Like O'Donnell, he kept only a portion of that amount as payment for his fees, and delivered the rest to other attorneys. On October 30, 1992, several months before Stephen was convicted, $50,000, in cash, was left for Finta at a local attorney's office. Finta kept $41,000 and transferred the other $9,000 to attorney Robert Luskin, who also represented Stephen. The remaining $419,200 was received by Finta after Stephen was convicted, and Finta

kept $242,000. One hundred thousand dollars was wire transferred to Finta from O'Donnell's office. The rest, $319,200, was delivered in six installments between May, 1993 and February, 1994. Those deliveries were made by unidentified individuals and consisted of envelopes containing cash that were left at a hotel in Warwick, Rhode Island where Finta was staying, or in the trunk of a rental car parked at the hotel.

### *Analysis*

#### I. *Estoppel*

##### A. *The Legal Principles*

 The doctrine of equitable estoppel precludes a party from asserting a claim that is based upon misrepresentations made by that party that reasonably were relied upon by the person to whom they were made. *See Clauson v. Smith,* 823 F.2d 660, 661 (1st Cir.1987). However, the doctrine of equitable estoppel, generally, "will not be applied against the government as readily as it may be asserted against private individuals," *Griffin v. Reich,* 956 F.Supp. 98, 106 (D.R.I.1997), because "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984).

 A party seeking to invoke estoppel against the government must show that government agents engaged in "affirmative misconduct"; that such party reasonably relied upon the conduct of the government agents and that, as a result, such party has suffered some detriment. *See U.S. v. Ven–Fuel, Inc.,* 758 F.2d 741, 761 (1st Cir.1985); *Akbarin v. Immigration*

*and Naturalization Service,* 669 F.2d 839, 842 (1st Cir.1982); *Griffin,* 956 F.Supp. at 107. In cases where promises are made by individuals who lack *actual* authority to bind the government, the government rarely will be held to be estopped. *Hachikian v. Federal Deposit Insurance Corporation,* 96 F.3d 502, 506 (1st Cir.1996)("equitable estoppel is generally inapplicable to the federal government when its employees induce reliance by their unauthorized actions"); *Phelps v. Federal Emergency Management Agency,* 785 F.2d 13, 18 (1st Cir.1986)("[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority ... [a]nd this is so even though ... the agent himself may have been unaware of the limitations upon his authority.")

### B. *Applicability in this Case*

■ In this case, the Saccoccias' attorneys have failed to establish that any promise was made that the government would not seek forfeiture of money paid to them as attorneys' fees. Leavey told Hill, O'Donnell, and Semenza only that the U.S. Attorney in Rhode Island had never sought to forfeit attorneys' fees. While it may have been reasonable for the attorneys to conclude from that statement that forfeiture was unlikely, the statement falls far short of a promise not to seek forfeiture. Moreover, Leavey's expression of his willingness to include a non-forfeiture provision in any plea agreement with Stephen Saccoccia, and to seek approval of that provision from the U.S. Attorney, was conditioned upon a plea agreement being reached. As already noted, that condition never was fulfilled.

In any event, it is clear that Leavey had no authority to promise that the government would refrain from seeking forfeiture and that Hill, at least, was aware of Leavey's lack of authority. Hill acknowledged to both Leavey and O'Donnell that he knew that any such agreement required approval from the Department of Justice. Furthermore, a copy of an American Bar Association publication entitled *Protecting Yourself and Your Fee: a Defense Lawyer's Practice Guide in a New Age of Federal Law,* was found in Hill's hotel room when Austrian authorities arrested him on July 28, 1992.[2] That publication quoted the following provision contained in the U.S. Attorney's manual:

> No formal or informal, written or oral, agreements may be made to exempt an asset transferred to an attorney as fees for legal services from forfeiture under 18 U.S.C. § 1963 or 21 U.S.C. § 853 or any civil forfeiture statute without the prior approval of the Assistant Attorney General, Criminal Division.

Inasmuch as the Saccoccias' attorneys have failed to establish the requisite elements of estoppel against the government, the issue becomes whether the fees paid to the attorneys are forfeitable.

### II. *Forfeitability Under § 1963*

#### A. *RICO Forfeiture, in General*

Forfeiture of property belonging to a defendant convicted of a RICO violation is governed by 18 U.S.C. § 1963. Under that section there are two general categories of property subject to forfeiture:

1. Property described in § 1963(a) that consists of any interest acquired in violation of RICO, any interest in the RICO enterprise, and/or proper-

---

**2.** Hill apparently was attempting to gain access to safe deposit boxes that Stephen maintained at an Austrian bank.

ty "constituting, or derived from, any proceeds ... from racketeering activity." § 1963(a).[3] Such assets may be referred to as "tainted" assets because they are linked to the defendant's criminal activity.

2. Any other assets belonging to the defendant which a court orders forfeited, pursuant to § 1963(m),[4] upon a showing that the proceeds of the defendant's illegal activity and the property derived from those proceeds have been concealed, transferred or dissipated. Such assets are referred to as "substitute" assets.

The process of forfeiting "tainted" assets begins when a verdict is returned that the assets are forfeitable under § 1963(a). At that time, a preliminary order of forfeiture may be entered that authorizes the Attorney General to seize the assets, and permits third parties to assert claims to those assets. At the time of sentencing, a final order of forfeiture is included in the judgment. Fed.R.Crim.P. 32(d)(2).[5] If the defendant no longer possesses "tainted" assets of sufficient value to satisfy a forfeiture judgment, § 1963(m) permits the Court to order the forfeiture of "substitute" assets to the extent necessary to make up the deficiency.

■ While subsection (a) requires that "tainted" assets must be "traceable" to the illegal activity for which the defendant was convicted, subsection (m) contains no such "tracing" requirement for "substitute" assets. Moreover, while "tainted" assets are immediately forfeitable, "substitute" assets do not become forfeitable until the Court determines that the requirements of subsection (m) are satisfied and an order of

---

**3.** 18 U.S.C. § 1963(a) provides in pertinent part that "Whoever violates [RICO] ... shall forfeit to the United States ...

(1) any interest the person has acquired or maintained in violation of [RICO];

(2) any interest in ... any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of [RICO]; and

(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity ... in violation of [RICO]".

**4.** 18 U.S.C. § 1963(m) provides that "If any [tainted asset], as a result of any act or omission of the defendant—

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be divided without difficulty; the court shall order the forfeiture of any other property of the defendant up to the value of any property described in paragraphs (1) through (5)".

**5.** When this case began, in 1991, criminal forfeitures were governed by Fed. R.Crim. Proc. 32(b)(2), which merely provided that when a verdict finding property forfeitable is returned, the judgment of criminal forfeiture shall authorize the Attorney General to seize the property subject to conditions set by the court. This provision was subsequently reclassified as subsection (d)(2) in 1994, and substantively amended in 1996 to allow for a preliminary order of forfeiture prior to sentencing that would allow the Attorney General to seize the property subject to forfeiture, to conduct discovery necessary to help identify and locate the property, and to begin proceedings to account for any rights in the property claimed by third parties. The rule was amended yet again in 2000, and reclassified as new Rule 32.2. The 2000 version of the rule expands on the provisions for entry of a preliminary order of forfeiture, ancillary proceedings to determine the rights of third parties in the property, and the entry of a final order of forfeiture. The new rule also, for the first time, includes a section dealing with forfeiture of substitute property. *See* Fed. R.Crim. Proc. 32.2.

forfeiture is entered. *United States v. Hurley*, 63 F.3d 1, 23–24 (1st Cir.1995).

### B. *Forfeiture Under the "Relation Back" Provisions of § 1963(c)*

When "tainted" assets have been transferred to a third party, their forfeiture is governed by § 1963(c). Under § 1963(c), property that is "described in subsection (a)" (i.e. "tainted" assets traceable to a RICO violation) vests in the United States at the time the RICO offense is committed and those assets remain forfeitable even if they have been transferred to a third person unless the transferee is a bona fide purchaser ("BFP") without notice. Thus, § 1963(c) provides:

> (c) All right, title, and interest in property *described in subsection (a)* vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (*l*) that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

18 U.S.C. § 1963(c) [emphasis added].

Subsection(c) does not make any exception for attorneys' fees. Indeed, the Supreme Court has held that because "tainted" assets belong to the government *ab initio,* a defendant cannot divest the government of its title by using those assets to pay counsel. *United States v. Monsanto,* 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989); *Caplin & Drysdale,*

*Chartered v. United States,* 491 U.S. 617, 109 S.Ct. 2667, 105 L.Ed.2d 528 (1989). Nevertheless, because forfeitability of fees paid to an attorney may severely limit a defendant's ability to obtain counsel of his choice, forfeitability of attorneys' fees under § 1963(c) must be clearly established.

In this case, the government contends that the fees paid to the attorneys is property "described in subsection (a)" because it "constitut[ed], or derived from, [the] proceeds" of the Saccoccia's RICO violations. 18 U.S.C. § 1963(a)(3). The government has the burden of proving that particular property is subject to forfeiture under subsection (a) and, therefore, forfeitable under the "relation back" provision of § 1963(c). The First Circuit has declined to specify what burden of proof applies, but, it has implied that the burden is something less than proof beyond a reasonable doubt. *U.S. v. Houlihan,* 92 F.3d 1271, 1299 n. 33 (1st Cir.1996) ("We note, however-although we leave the question open-that the government may have conceded too much" by agreeing that the government has the burden of proving entitlement to forfeiture beyond a reasonable doubt). That implication appears to have been reinforced by the holding in *U.S. v. Rogers,* 102 F.3d 641, 647–48 (1st Cir. 1996), that, in order to obtain forfeiture under 21 U.S.C. § 853, the government must prove the required link between the assets and the crime by a fair preponderance of the evidence. In *Rogers,* the First Circuit reasoned that forfeiture is a sentencing issue rather than an element of the offense; and, therefore, absent a specific statutory directive to the contrary, it is governed by a fair preponderance of the evidence standard. That reasoning seems equally applicable to the forfeiture provisions of § 1963. *But see U.S. v. Pelullo,* 14 F.3d 881, 905 (3rd Cir.1994) (holding

that forfeiture under § 853 requires proof by a fair preponderance of the evidence, but forfeiture under § 1963 requires proof beyond a reasonable doubt).

In any event, once the government has met its initial burden, the burden of proof then shifts to the transferee attorneys to show that they were "bona fide purchaser[s] for value" and that they lacked "cause to believe that the property was subject to forfeiture under [§ 1963(a)]." 18 U.S.C. § 1963(c).

■ An attorney is a BFP for value to the extent that the amount paid to the attorney represents a reasonable fee for legal services rendered by the attorney. *Caplin & Drysdale,* 491 U.S. at 632, n. 10, 109 S.Ct. 2667; *In re Moffitt, Zwerling, & Kemler,* 846 F.Supp. 463, 477–78 (E.D.Va. 1994). Here, the government does not dispute the reasonableness of the fees in question. Accordingly, the issues with respect to forfeiture under the "relation back" provisions of § 1963(c) are whether the government has proven that the assets transferred were "proceeds" of racketeering activity subject to forfeiture under § 1963(a); and, if so, whether the attorneys qualify for the BFP exception.

### (1) *Forfeitability of the Property Transferred*

■ Even if a reasonable doubt standard is applied, the circumstantial evidence in this case is sufficient to establish that the fees paid to counsel constituted or were derived from proceeds of the Saccoccias' racketeering activity. The Saccoccias were convicted of laundering nearly $140 million. To date, the government has located only about $10 million in assets belonging to the Saccoccias. *See U.S. v. Saccoccia,* 62 F.Supp.2d 539, 540 (D.R.I. 1999). Thus, a substantial portion of the proceeds remains unaccounted for. Furthermore, it is clear that the $1.9 million known to have been paid to the Saccoccias' attorneys [6] could not have been generated by the precious metals refining business and coin shop that were the Saccoccias' only "legitimate" sources of income. The evidence presented at trial indicates that those businesses were not particularly profitable and that they served, primarily, as "fronts" for the money laundering activity to which Stephen and his employees devoted most of their time and effort. Indeed, in forfeiting the assets of those businesses, the government realized only approximately $237,000.

The conclusion that the attorneys' fees at issue were derived from the proceeds of the Saccoccias' money laundering activities is buttressed by the circumstances under which many of the payments were made. As already noted, substantial sums were wired from an attorney in Switzerland where the Saccoccias were apprehended, and where they had secreted assets. In addition, large amounts of cash were delivered by anonymous individuals and, in Finta's case, under especially suspicious circumstances. Consequently, the question is whether the attorneys are BFP's within the meaning of § 1963(c).

### (2) *The Bona Fide Purchaser Requirement*

In order to qualify as a BFP under § 1963(c), a transferee of "tainted" property must prove that he acquired the property for value and that "at the time of [transfer]," he "was reasonably without cause to

---

**6.** In addition to the $1,219,485 now at issue, approximately $733,000 was paid to attorney Robert Luskin, who settled the government's forfeiture claim against him.

believe that the property was subject to forfeiture" as "tainted" assets. 18 U.S.C. § 1963(c). In this case, the attorneys have only partially succeeded in carrying that burden.

In order to have reasonable cause to believe that particular property belonging to a RICO defendant is "subject to forfeiture" within the meaning of § 1963(c), one must have reasonable cause to believe first, that the defendant will be convicted and second, that the property in question is "property described in subsection (a)."

What constitutes reasonable cause for an attorney to believe that his client will be convicted is a vexing question. It could be argued that an indictment, alone, is sufficient because it reflects a grand jury's finding of probable cause to believe that the defendant may be guilty. In fact, under § 1963(a)(2)(A), an indictment charging a defendant with a RICO violation and alleging that particular property would be subject to forfeiture if the defendant is convicted permits the entry of an *ex parte* order restraining the transfer of that property. On the other hand, it could be argued that, since an indictment is based solely on evidence presented by the government which a defendant has no opportunity to challenge, an indictment, alone, is not a sufficient ground for inferring reasonable cause for the defendant's attorney to believe that the defendant probably will be convicted. Indeed, as a practical matter, such an inference would deny virtually every defendant accused of an offense carrying a forfeiture penalty of the right to counsel of his or her choice because the risk of not being paid would deter most attorneys from accepting such cases. That, in turn, would shift to the taxpayers the considerable cost of paying counsel appointed to represent those defendants.

■ Here, there is no need to grapple with this thorny question because, before the Saccoccias were convicted, the attorneys did not have reasonable cause to believe that the fees paid to them came from the proceeds of money laundering activity; and, after the Saccoccias were convicted, they had cause to believe both that and that the Saccoccias were guilty.

While Leavey's statements do not estop the government from seeking forfeiture of the fees paid to the attorneys, they did provide a reasonable basis for the attorneys to infer that the government was implicitly acknowledging that the Saccoccias might have some legitimately derived assets with which to pay attorneys' fees. In addition, the fact that Hill, O'Donnell and Semenza openly inquired of Leavey about the government's position with respect to forfeiture of any fees that they might receive, and the absence of any effort on their part to conceal that they were being paid by the Saccoccias suggest that, at least initially, they subjectively believed that the fees paid to them did not come from the proceeds of the Saccoccias' money laundering activity.

However, such belief ceased being reasonable once the Saccoccias were convicted. At that point, there no longer was any reasonable doubt about the Saccoccias' guilt, and it had become clear that virtually all of their assets were proceeds of their RICO violations. As already noted, the evidence presented at trial showed that the Saccoccias' "legitimate" businesses were little more than "fronts" for their money laundering activity, a fact that, subsequently, was confirmed by the minimal amount realized when the government forfeited the assets of those businesses.

The attorneys' cause to believe that post-conviction payments made to them were derived from forfeitable assets is un-

derscored by the circumstances under which those payments were made. The covert deliveries of large quantities of cash, made by anonymous intermediaries, sometimes, with instructions to distribute portions to friends or relatives of the Saccoccias certainly should have alerted all of the attorneys to the likelihood that those payments came from money laundering proceeds.

The fees paid to the attorneys *before* the Saccoccias were convicted and that are *not* forfeitable under § 1963(c) include $250,000 paid to Hill; $65,000 paid to O'Donnell; $331,500 paid to Semenza, and $41,000 paid to Finta. On the other hand, the fees paid *after* the Saccoccias' convictions and that *are* forfeitable under the "relation back" provision of § 1963(c) include $254,985 paid to Hill; $42,500 paid to O'Donnell and $242,000 paid to Finta.

### III. *Forfeitability Under the Substitute Assets Provision of § 1963(m)*

█ The government's argument that any fees not forfeitable under § 1963(c) are forfeitable under the "substitute" assets provision of § 1963(m) requires little discussion. Unlike subsection (c), subsection (m) does not contain any "relation back" provision.[7] Thus, assets do not become forfeitable as substitute assets unless and until a court has determined that the requirements of subsection (m) have been satisfied and a forfeiture order has been entered. Put another way, untainted assets that are transferred to a BFP do not become retroactively forfeitable if, later, the government is unable to locate "tainted" property sufficient to satisfy a forfeiture judgment.

In this case, no order forfeiting substitute assets was entered until August 31, 1993, long after the fees that have been determined not to be forfeitable under § 1963(c) were paid. Therefore, those fees are not forfeitable under § 1963(m) either.

### IV. *The Effect of the Protective Order*

The government argues that, even if the attorneys' fees paid before the Saccoccias' convictions are not forfeitable under § 1963(c) or § 1963(m), they are forfeitable because they were transferred in violation of Judge Boyle's November 23, 1991, Protective Order. However, that argument does not withstand scrutiny.

Subsection 1963(d)(1) provides that, upon the filing of a RICO indictment containing forfeiture allegations, "the court may enter a restraining order or injunction ... to *preserve the availability of property described in subsection (a)* for forfeiture ..." 18 U.S.C. § 1963(d)(1) [emphasis added]. As already noted, "property described in subsection (a)" refers to "tainted" assets consisting of any interest that the defendant acquired in the RICO enterprise and any assets constituting or derived from the proceeds of racketeering activity. Thus, the manifest purpose of subsection (d)(1) is to prevent a defendant from putting "tainted" assets out of the government's reach before a forfeiture judgment can be entered.

The mere fact that an order is entered enjoining the transfer of property does not make the property forfeitable. Nor does the property become forfeitable solely because it is transferred in violation of such

---

**7.** However, presumably, the government, as a judgment creditor, could reach any assets of a defendant that were fraudulently transferred.

an order. If that were so, property described in or transferred in violation of such an order would become forfeitable even if it, later, was determined *not* to be "property described in subsection (a)." Such legal alchemy would violate the plain language of subsection (d)(1). It also would stretch subsection (d)(1) far beyond its stated purpose of *"preserv[ing] the availability"* of the property for later forfeiture, which implicitly contemplates that, ultimately, the property must be independently proven to be forfeitable.

In this case, if the attorneys knew that the amounts paid to them were derived from "tainted" assets covered by the Protective Order, they could be punished for contempt and an appropriate sanction might be disgorgement of those fees. However, as previously stated, the attorneys lacked such knowledge, at least with respect to the payments received prior to the Saccoccias' convictions. Furthermore, the government is not seeking to hold the attorneys in contempt. Rather, it is seeking forfeiture of the amounts paid to them.

Forfeiture is a statutory creation, and forfeiture of "tainted" property that has been transferred to a third person is governed by § 1963(c) which protects transferees who were BFP's "without cause to believe that the property was subject to forfeiture." Nothing in subsection (d)(1) indicates any intent by Congress to negate the BFP protection created by subsection (c).

Accordingly, the attorneys in this case are BFP's under subsection (c) with re-spect to the payments received prior to the Saccoccias' convictions, and those payments do not become forfeitable merely because it, later, was determined that those payments were made with property that was subject to the Protective Order.

### Conclusion

For all of the foregoing reasons, the government's motion is denied with respect to the following payments:

| | |
|---|---|
| Jack Hill: | $250,000 |
| Kenneth O'Donnell: | $ 65,000 |
| Lawrence Semenza: | $331,500 |
| Stephen J. Finta: | $ 41,000 |

The government's motion is granted with respect to the following payments:

| | |
|---|---|
| Jack Hill: | $254,985 |
| Kenneth O'Donnell: | $ 42,500 |
| Stephen J. Finta: | $242,000 |

IT IS SO ORDERED,