Donna SACCOCCIA, Petitioner,

v.

UNITED STATES, Respondent.

Stephen A. Saccoccia, Petitioner,

v.

United States, Respondent.

Nos. 99–2310, 99–2341, 02–1556.

United States Court of Appeals, First Circuit.

July 29, 2002.

Mark E. Overland and James Moretti on memorandum for petitioner, Stephen A. Saccoccia.

William J. Murphy on memorandum for petitioner, Donna Saccoccia.

Before BOUDIN, Chief Judge, SELYA and LIPEZ, Circuit Judges.

PER CURIAM.

Petitioners Stephen and Donna Saccoccia were convicted of multiple offenses involving the laundering of proceeds from illegal drug transactions. After their convictions and sentences were affirmed on appeal, *see United States v. Saccoccia,* 58 F.3d 754 (1st Cir.1995); *United States v. Hurley,* 63 F.3d 1 (1st Cir.1995), they filed motions under 28 U.S.C. § 2255 to vacate their sentences, advancing a series of claims. In a pair of comprehensive decisions (one of which is published, the other not), the district court denied relief and thereafter declined to issue a certificate of appealability (COA). *See Saccoccia v. United States,* 69 F.Supp.2d 297 (D.R.I. 1999). Petitioners, through counsel, have

now filed separate applications with this court for COAs.

In order to qualify for a COA, a habeas petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires a demonstration that "reasonable jurists could debate whether ... the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) (internal quotation marks omitted)). Having scrutinized the parties' filings and the underlying record, we conclude that neither petitioner has satisfied this standard. We reach this conclusion substantially for the reasons recited by the district court, adding only the following observations with respect to some of the claims advanced.

## I. *Stephen Saccoccia's Petition (No. 99–2341)*

### 1. *Interference with Right to Assistance of Counsel* [1]

■ The speculative nature of Stephen's assertion that the United States government caused his attorney (Jack Hill) to be arrested deserves emphasis. Indeed, the precise nature of his complaint in this regard is never explained. To the extent Stephen is alleging that the government purposefully interfered with Hill's preparations, his contention is belied by his own suggestion that the "trap" was intended for someone else. And to the extent he is alleging that the government's actions had the effect of rendering Hill ineffective, the district court justifiably concluded that the mistrial and severance had eliminated that concern (even though the "four month delay" there cited was in fact three months). *See* 69 F.Supp.2d at 300–01; *cf. Saccoccia,* 58 F.3d at 771 (upholding denial of request for continuance after finding that "the means for efficacious preparation were tidily at hand").

### 2. *Double Jeopardy*

Apart from the issues addressed by the district court, Stephen has hinted at an additional argument: that, because of government overreaching and Hill's conflict of interest, his request for a mistrial was coerced and invalid, with the result that the government had to establish manifest necessity for the mistrial. Yet the charges of overreaching and conflict of interest are unsupported. And this claim overlooks the sudden incapacity of Attorney Brian Adae.

### 3. *Conflict of Interest*

■ The contention that Hill's potential conflict constituted a *per se* violation of the Sixth Amendment is further belied by intervening case law. We recently rejected a *per se* rule in analogous circumstances, holding that "a defendant has not shown a fatal conflict by showing only that his lawyer was under investigation [for related criminal activity] and that the lawyer had some awareness of an investigation." *Reyes–Vejerano v. United States,* 276 F.3d 94, 99 (1st Cir.2002); *cf. Mickens v. Taylor,* —— U.S. ——, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (rejecting "automatic reversal" rule where trial court fails to inquire into potential conflict about which it knew or reasonably should have known).

---

1. For ease of reference, we have used section headings corresponding to those of the district court.

Stephen's challenge to the validity of his waiver also clearly fails. To the extent it rests on an assertion that the United States' investigation of Hill was ongoing (unbeknownst to Stephen), the claim is factually unsupported. And to the extent it rests on an assertion that Stephen was unaware of the details of that investigation, it provides no basis for relief. Before accepting the waiver, the court specifically cautioned Stephen that Hill might have an incentive to conduct the trial in a manner that would serve his own interests rather than those of his client. This same warning would have sufficed even if Stephen had been more fully informed about the Hill investigation.

■ Beyond these points, Stephen asserts that his waiver was invalid for three additional reasons. He contends that: (1) he was unaware of other key facts; (2) Attorney Kenneth O'Donnell withheld any advice about whether to sign the waiver; and (3) Stephen was coerced into signing by Hill and Donna's attorney (Lawrence Semenza). As to the first, we have examined the "facts" in question and find them to be of scant significance. And the other two assertions are undermined by Stephen's own remarks at the waiver hearing. See 12/10/92 Tr. at 22 (indicating he had rejected O'Donnell's advice to secure an opinion from another attorney); id. at 29 (denying that anyone had pressured him to sign the waiver).

The related argument advanced by Stephen—that, notwithstanding the waiver, Hill suffered from an actual conflict that adversely affected the adequacy of his representation—likewise falls short. Stephen points in this regard to various alleged omissions by Hill. Yet as the district court noted, he has not made either of the requisite showings in this regard—i.e., that one or more of these challenges had a plausible chance of succeeding, and that Hill's fail-

ure to pursue them was linked to his alleged conflict. See, e.g., Reyes–Vejerano, 276 F.3d at 97. Hill's failure to challenge the seizure of attorney-client materials, although not mentioned by the district court in this context, would not warrant relief for the reasons the court described elsewhere.

Stephen's attempt to beef up an argument previously rejected on direct appeal—that his co-counsel O'Donnell likewise suffered from a conflict of interest—also proves unavailing. His suggestion that a March 1993 defense proffer put the district court on notice three months earlier of a potential conflict is obviously mistaken. His assertion that failure to inquire into a potential conflict requires automatic reversal is at odds with the Supreme Court's recent Mickens decision. And his own evidence, see Dkt. 1, Exh. 13, at 6–7, buttresses our earlier finding that nothing in the record "suggests that Marotto had any knowledge that might have been useful in [Stephen's] defense." Saccoccia, 58 F.3d at 772.

■ Finally, Stephen contends that both of his trial attorneys suffered from an additional conflict, stemming from the fact that they accepted payment from assets subject to a protective order. Yet there has never been any hint of a criminal investigation along these lines. And the district court later held that all fees received prior to the date of conviction were not subject to forfeiture. See United States v. Saccoccia, 165 F.Supp.2d 103 (D.R.I.2001).

### 4. Brady Violations

■ It is undisputed that Barry Slomovits testified falsely at Stephen's trial. During cross-examination, he denied that any of his business partners had known about his money-laundering activities; the government later revealed that he had lied

about the noninvolvement of his partner Alan Finkelstein. Stephen now alleges that the prosecutors were aware of such perjury at the time. Yet he relies solely on an August 1994 affidavit from a Customs agent in New York, who stated that Finkelstein had been under investigation since February 1991 (approximately two years prior to Stephen's trial). This affidavit was insufficient to trigger a further inquiry by the habeas court. Not only did it make no mention of Slomovits, but Slomovits had specifically denied Finkelstein's involvement during government debriefings held between 1992 and 1994. In any event, even if we assume arguendo that the government knowingly failed to correct such perjury, the error would be harmless if it "more likely than not had no effect on the verdict." *Gilday v. Callahan*, 59 F.3d 257, 269 (1st Cir.1995). Given the tangential nature of Slomovits' falsehood, the fact that it appeared only in a single exchange on cross-examination, and the overwhelming evidence of Stephen's guilt, such would certainly be the case here.[2] Much the same analysis applies to the alleged perjury by Ahron Sharir.

### 5. *The § 1957 Convictions*

In a muddled ineffective-assistance claim, Stephen complains of counsel's failure to object to the jury instructions regarding 18 U.S.C. § 1957. The district court determined that this argument could have been raised on direct appeal and so was procedurally defaulted. *See* 69 F.Supp.2d at 305–06. As the claim plainly fails on the merits, we prefer to dispose of it on that basis. It suffices to note the following. First, the specific language about which Stephen complains was not part of the court's instructions. Second,

§ 1957 does not, as he suggests, require that "all" of the transferred funds have a drug source; even under *United States v. Rutgard*, 116 F.3d 1270 (9th Cir.1997), upon which he relies, it need only be shown that each transfer included more than $10,000 in tainted funds. Third, the charge here would seemingly pass muster under *Rutgard*. And even if not, it is never explained why counsel would have been deficient for not anticipating the emergence of this line of authority. Finally, Stephen ignores the fact that laundered drug proceeds could appear in his account as ostensibly "legitimate" funds.

### 6. *The § 1956 Convictions*

Trial Exhibit 2312 (which Stephen misidentifies as Exh. 2310) effectively belies his renewed challenge to the evidence supporting these convictions.

### 7. *Interception of Attorney–Client Communications*

This claim, although the subject of considerable attention below, likewise requires little comment. The district court made detailed findings after an evidentiary hearing—determining that only two of the exhibits in question had been forwarded to the prosecution; that the first of these was nonprivileged; and that the second, even if privileged, was so vague that disclosure thereof entailed no prejudice. Stephen has advanced no challenge to such findings, and our review of the record reveals them to be fully supportable.

### 8. *Apprendi Claim*

Finally, Stephen seeks to supplement his COA application to include a

---

**2.** We thus need not address the district court's conclusion that, where the government is alleged to have unwittingly relied on perjured testimony, a § 2255 petition "is gov-

erned by the standard applicable to a motion for a new trial based on newly discovered evidence." 69 F.Supp.2d at 304.

claim under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Yet even if *Apprendi* proves to be cognizable on collateral review, this claim would fail. "[T]he vice in *Apprendi* was the imposition of a sentence on a single count ... in excess of the statutory maximum for that count." *United States v. Feola*, 275 F.3d 216, 220 n. 1 (2d Cir.2001) (per curiam). That did not occur here. As we explained on direct appeal, the sentencing court "imposed the longest possible sentence on each count and ran the sentences consecutive to one another." 58 F.3d at 786. This was done, we noted, pursuant to U.S.S.G. § 5G1.2(d), which "require[s] imposition of consecutive sentences 'to the extent necessary to produce a combined sentence equal to the total punishment.'" *Id.* (quoting guideline). Contrary to Stephen's suggestion, *Apprendi* poses no bar under these circumstances to the imposition of consecutive sentences under § 5G1.2(d), even when "the total punishment exceeds the highest statutory maximum on any particular count." *United States v. McWaine*, 290 F.3d 269, 276 (5th Cir.2002); *accord, e.g., Feola*, 275 F.3d at 220 n. 1.

## II. *Donna Saccoccia's Petition (No. 99–2310)*

### 1. *Mental Competency/Ineffective Assistance*

■ Donna first faults Semenza, her main trial lawyer, for delay in pursuing the question of her mental competency. We doubt that counsel's performance could be deemed deficient in this regard. For example, contrary to Donna's suggestion, the magistrate judge at the hearing held on July 23, 1992 did not "instruct" or "admonish" him to obtain a psychiatric evaluation. And Semenza mentioned two months later that Donna had been "assisting" him with the defense preparations. Regardless, Donna has failed to satisfy the prejudice requirement for the reasons cited by the district court.

### 2. *Failure to Transmit Plea Offer*

■ Donna here claims that Semenza failed to advise the government of her desire to cooperate and plead guilty and, moreover, failed to advise her of a plea offer from the government. As she notes, an attorney's failure to notify a defendant of a plea offer can constitute ineffective assistance in and of itself. *See, e.g., United States v. Rodriguez Rodriguez*, 929 F.2d 747, 752, 753 (1st Cir.1991) (per curiam). Moreover, Donna contends that Semenza had an incentive to prevent her from cooperating due to a conflict of interest on his part, stemming mainly from the fact that Stephen was paying his legal fees. The Supreme Court has taken note of the "inherent dangers" that can arise from such a fees arrangement. *Wood v. Georgia*, 450 U.S. 261, 268, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). And in *Rodriguez*, where a § 2255 petitioner charged that counsel had failed to advise him of a plea offer because of such a conflict, we deemed the claim "a sufficient allegation of 'adverse effect' on representation to warrant a hearing." 929 F.2d at 752.

Nonetheless, Donna provides no basis for questioning the district court's finding that the discussion of November 18, 1992 was "neither specific nor definite enough to constitute a plea offer." The alleged "offer" was voiced to Stephen (albeit in the presence of Donna's attorney), and the participants had emphasized that the discussion was not a plea negotiation. Donna construes the proposal, not unreasonably, as calling for a guilty plea to one or more of the § 1956 offenses (rather than for a flat 20–year sentence), such that the acceptance would have resulted in a lower prison term than the one ultimately imposed.

Yet this does not add up, for she acknowledges that her offense level would have been the same whether she pled guilty to a single § 1956 charge or to the entire indictment. This means that, in terms of impact on her sentence, the alleged offer was without importance; the same benefit—the securing of a reduction for acceptance of responsibility—would have been achieved had she pled guilty to all charges. Even without learning of the discussion, Donna was obviously aware of the latter option.

In any event, the fact that Donna waited almost four years after trial before complaining about her unfulfilled wish in this regard "draws into serious question" the validity of this claim. *Ouellette v. United States,* 862 F.2d 371, 375 (1st Cir.1988). Her contention is also belied by her own words. After proclaiming her innocence in a brief allocution at sentencing, she told the court: "If I knowingly and intentionally had committed a criminal offense, I would have pled guilty and not have elected to go to trial."

### 3. *Joint Representation*

 When Adae appeared as local counsel for both Stephen and Donna, the magistrate judge explained the dangers of joint representation during a so-called *Foster* hearing. *See United States v. Foster,* 469 F.2d 1 (1st Cir.1972). The two petitioners nonetheless persisted in their choice of Adae and waived their right to conflict-free counsel. Although her argument is muddled, Donna now apparently contends that the court was required to hold a second *Foster* hearing once Adae,

while still serving as her local counsel, was elevated to the position of lead counsel for Stephen. The failure to conduct a second such inquiry, she insists, requires automatic reversal.

Donna has not explained, and we fail to see, why a second hearing was needed. Whether Adae was serving as lead or local counsel for Stephen, the same dangers of joint representation would seem to have been presented—dangers that were fully elucidated at the first hearing. Moreover, the Supreme Court's recent *Mickens* decision negates her "automatic reversal" argument, and Donna has not even attempted to demonstrate how Adae's alleged conflict adversely affected the representation that she received.

### 4. *Extradition*

 In Stephen's direct appeal, we held that the so-called CTR offenses, although nonextraditable, could nonetheless be relied on as predicate offenses without contravening the rule of specialty. *See Saccoccia,* 58 F.3d at 764–69. In Donna's direct appeal, we relied on this analysis in rejecting the same claim.[3] *See Hurley,* 63 F.3d at 24. Donna now alleges that post-trial developments in Switzerland call this holding into question. Having reviewed her submissions, we fail to see how. It suffices to make three points. First, Donna has misstated the conclusions of the Swiss Institute of Comparative Law. That body did not find that the CTR violations "were, in fact, used to prosecute and to punish Donna" but, rather, found that they might have been used in such fashion.

---

**3.** We clarify one apparent source of confusion in Donna's pleadings. The disposition of this claim in *Saccoccia* rested on two rationales. First, because extradition had been approved "on counts that prominently featured CTR offenses as predicates," 58 F.3d at 768, we deemed it evident that the Swiss authorities

had endorsed the practice. Second, we noted that the trial court had taken "prophylactic" measures to delete the CTR references. *Id.* Inasmuch as no such measures had been taken at Donna's trial, we necessarily relied in *Hurley* on the first rationale set forth in *Saccoccia.*

Second, contrary to her charge of concealment, both the Institute and the Swiss Federal Department of Justice and Police noted that the CTR references had not been deleted in Donna's case. Finally, from all that appears, none of the Swiss organizations in question suggested that a treaty violation occurred here. We thus discern no basis for revisiting the issue.

### III. *Stephen's Second Petition (No. 02–1556)*

Stephen has recently applied for leave to file a second or successive petition (or in the alternative to amend his first petition). He alleges that Hill failed to inform him of a government "proposal," supposedly proffered in February 1992, concerning a possible plea agreement. Yet Stephen simply points in this regard to a reference to plea discussions appearing in the district court's forfeiture decision. *See Saccoccia,*

165 F.Supp.2d at 106. No mention is there made of any specific offer that might have triggered counsel's duty to consult with his client. In any event, this claim falls well short of satisfying the pertinent gatekeeping criterion. *See* 28 U.S.C. § 2255(¶ 8).

### IV. *Conclusion*

For these reasons, the applications for a COA in Nos. 99–2310 & 99–2341 are *denied* and the appeals are *terminated.* The application for leave to file a second or successive petition in No. 02–1556 is *denied.*