UNITED STATES of America

v.

Stephen SACCOCCIA, et al.

C.R. No. 91–115–T.

United States District Court,
D. Rhode Island.

Oct. 25, 2004.

Michael Iannotti, AUSA, Providence, RI, for Plaintiff.

Lauren Jones, Esq., Providence, RI, for Defendants.

### *MEMORANDUM AND ORDER*

TORRES, Chief Judge.

#### *Introduction*

The United States (the government) has moved to compel the disgorgement of attorneys' fees paid to attorneys for Stephen Saccoccia on the ground that payment of the fees was an act of civil contempt because it violated a Protective Order prohibiting Saccoccia from transferring $144 million that Saccoccia was accused of obtaining by laundering the proceeds of illegal drug sales. The questions presented

are whether the government's motion is barred by the doctrine of laches; and, if not, whether the government has proven, by clear and convincing evidence, that payment of the fees was an act of civil contempt.

Because the Court answers the first question in the negative and the second question in the affirmative, the motion to compel disgorgement is granted and attorneys Jack Hill and Kenneth O'Donnell are ordered to pay the government the sums of $254,985 and $42,000, respectively, which are the portions of the fees paid to them after Saccoccia was convicted of RICO conspiracy.

### Background

In 1991, Saccoccia and several other defendants were indicted for RICO conspiracy and a variety of other offenses arising out of a scheme to launder $140 million in proceeds from the unlawful distribution of controlled substances. The indictment contained a count seeking forfeiture of the proceeds and, four days after the indictment was returned, Judge Boyle, pursuant to 18 U.S.C. § 1963(d), entered an *ex parte* Protective Order (the "Protective Order") enjoining the defendants from transferring property that included "$140,000,000 in U.S. currency for which the defendants are jointly and severally liable."

Saccoccia was convicted in March of 1993; and, on June 4, 1993, this Court entered an order requiring him to forfeit the "proceeds" of the RICO conspiracy which amounted to more than $136 million.

In 1998, the government, pursuant to 18 U.S.C. § 1963, sought an order requiring two of Saccoccia's trial attorneys, Jack Hill and Kenneth O'Donnell (the "Attorneys"), as well as Stephen Finta, an attorney representing Saccoccia in connection with money laundering charges brought in California, to turn over all of the fees paid to them. The government claimed both that the fees were forfeitable under RICO and that payment of the fees violated the Protective Order.

This Court conducted an evidentiary hearing and, on July 31, 2001, issued a Memorandum and Order finding that the amounts paid to the three attorneys were "proceeds" of Saccoccia's racketeering activities. Because this Court determined that, once Saccoccia was convicted, the attorneys had reasonable cause to believe the fees were "tainted assets" subject to forfeiture, it ordered that those portions of the fees paid to the attorneys *after* Saccoccia's 1993 conviction be forfeited to the government. *United States v. Saccoccia,* 165 F.Supp.2d 103, 111–12 (D.R.I.2001), *vacated and remanded by United States v. Saccoccia,* 354 F.3d 9 (1st Cir.2003). The government's motion to require forfeiture of the fees paid *before* conviction was denied. *Id.* Hill, O'Donnell and Finta appealed but the government did not.

The Court of Appeals affirmed the order as to Finta, but held that, under RICO's forfeiture provisions, the fees paid to Hill and O'Donnell were not subject to forfeiture. The Court of Appeals held that, since Hill and O'Donnell had spent the fees paid to them, the amounts they were being asked to forfeit were not "proceeds" of racketeering; but, rather, were substitute assets of a third party that were not subject to forfeiture. *Saccoccia,* 354 F.3d at 13. Accordingly, the forfeiture order was vacated as to Hill and O'Donnell and the case was remanded to allow the government to pursue its claim against Hill and O'Donnell on a theory of conversion or civil contempt. *Id.* at 16.

The government has chosen to proceed on a civil contempt theory and relies largely on the findings made by this Court in its previous Memorandum and Order, 165

F.Supp.2d 103 (D.R.I.2001).[1] Hill and O'Donnell argue that the government's claim is barred by the doctrine of laches and that, in any event, the government has failed to prove the elements of contempt by clear and convincing evidence.

## Analysis

### I. Laches

■ Laches is an affirmative defense which permits a claim to be dismissed when there was an unreasonable delay in bringing it and the delay has prejudiced the party against whom the claim was brought. *Iglesias v. Mutual Life Ins. Co. of New York,* 156 F.3d 237, 243 (1st Cir. 1998); *Murphy v. Timberlane Reg'l Sch. Dist.,* 22 F.3d 1186, 1189 (1st Cir.1994).

■ Since laches is an equitable defense, it generally is "unavailable in actions at law governed by a statute of limitations." *U.A. Local 343 v. Nor–Cal Plumbing, Inc.,* 48 F.3d 1465, 1474 n. 3 (9th Cir.1994), *cert. denied,* 516 U.S. 912, 116 S.Ct. 297, 133 L.Ed.2d 203 (1995). However, in extreme cases, laches may bar claims made before the statute of limitations has expired. *See Patton v. Bearden,* 8 F.3d 343, 348 (6th Cir.1993) ("[O]n occasion, the doctrine [of laches] is applied to bar a stale claim prior to the statute of limitations; but should only be applied in such cases where there is gross laches in the prosecution of the claim."). In either event, in deciding whether laches bars a claim, a court must look at all the relevant circumstances. *Tri–Star Pictures, Inc. v. Leisure Time Prod., B.V.,* 17 F.3d 38, 44 (2d Cir.1994).

### A. Timeliness of Laches Defense

The government argues that laches was not raised in a timely manner. It relies on the principle that, because laches is an affirmative defense, a defendant's failure to assert it in his answer ordinarily constitutes a waiver of the defense. *See* Fed. R.Civ.P. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . laches . . . and any other matter constituting an avoidance or affirmative defense."); *see also, Jakobsen v. Massachusetts Port Auth.,* 520 F.2d 810, 813 (1st Cir.1975) ("The ordinary consequence of failing to plead an affirmative defense [i.e. the statute of limitations] is its forced waiver and its exclusion from the case.").

■ However, as the Attorneys point out, no answer was required in this case because there was no complaint given that the government's claim arises as part of the criminal case against Saccoccia. Consequently, the Attorneys had no occasion to raise the defense of laches until the government sought disgorgement on a civil contempt theory. Since the Attorneys asserted the laches defense promptly thereafter, there was no waiver.

### B. Applicability of Laches to the Government

■ The general rule is that laches cannot be asserted as a bar to an action brought by the United States to enforce a public right or protect the public interest. *United States v. Summerlin,* 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940) ("It is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights."); *see also, Texaco Puerto Rico, Inc. v. Dept. of Consumer Affairs,* 60 F.3d 867, 878 (1st Cir.1995). The rationale for that rule is that the negligence of public officers should not deprive the public of its rights, revenues or

1. The government seeks to recover only those fees paid *after* Saccoccia was convicted. It does not challenge this Court's finding that the attorneys are entitled to the fees paid *before* conviction.

property. *United States v. Philip Morris Inc.*, 300 F.Supp.2d 61, 72–73 (D.D.C. 2004). Indeed, the rule has been held specifically to preclude assertion of the laches defense in a civil RICO action brought by the government. *See id.* at 74 n. 18 (RICO's legislative history suggests Congress intended the doctrine of laches not to apply to suits pursuant to the statute).

■ One exception to the general rule is that laches may be asserted in contract actions brought by the government. *Id.* at 72. ("[T] he United States is subject to laches in certain restricted contexts, such as commercial suits."); *United States v. Lee*, C94–2026RMW EAI, 1995 WL 325972, at *3 (N.D.Cal. May 24, 1995) (stating that a minority of courts have held the government is subject to the defense of laches in "actions in contract"). Furthermore, the First Circuit has stated that laches may apply against the United States where the government's unreasonable delay has caused hardship. *See Texaco*, 60 F.3d at 878 (while "[i]t is true that laches ordinarily cannot be raised as a defense against the government in an action brought to enforce a public right or protect a public interest ... the unavailability of laches as a defense does not mean that the sovereign's dilatoriness in seeking an equitable remedy must be totally disregarded by a chancery court."); *see also Precious Metals Assoc. Inc. v. Commodity Futures Trading Comm'n.*, 620 F.2d 900, 910 (1st Cir.1980) (ultimately holding that laches did not apply, but noting that courts have applied laches "where unreasonable agency delay has caused hardship.").

There is no need to decide whether the laches defense may be applied against the government in this case because, in any event, it lacks merit.

### C. *The Merits of the Laches Defense*

■ As already noted, in order to establish the affirmative defense of laches, the Attorneys must show that the government unreasonably delayed in seeking to recover the fees at issue and that they have been prejudiced by the delay. The Attorneys have failed to do either.

The gist of the Attorneys' unreasonable delay argument is that the fees in question were paid in 1993 but the government waited until 1998 to file its motion to forfeit and until 2004 to allege that the Attorneys are in contempt for violating the 1991 Protective Order. That argument ignores the fact that the forfeiture proceedings have been ongoing since Saccoccia's conviction and that the government's efforts to recover the fees paid to the Attorneys began shortly thereafter. The government's efforts began with attempts to discover the nature and source of the fees, a process that consumed a considerable period of time, due partly to the Attorneys' resistance to revealing that information. *See United States v. Saccoccia*, 898 F.Supp. 53 (D.R.I.1995) (granting government's motion to depose attorneys and rejecting attorneys' claims of privilege in regard to fee arrangements with Saccoccia). Additional time was consumed in litigating the government's forfeiture claim.

The Attorneys' argument also ignores the fact that the Court of Appeals expressly invited the government, on remand, to seek disgorgement on a civil contempt theory. *Saccoccia*, 354 F.3d at 14, 15.

In addition, the Attorneys have failed to demonstrate that they have been unfairly prejudiced by the delay. The Attorneys argue that requiring them to disgorge the fees in question would prejudice them because the fees have been spent. That argument is not persuasive because the Attorneys were on notice, long before re-

ceiving the fees, that the government was asserting a claim to that money. The Protective Order was entered nearly two years before the fees in question were paid and the Attorneys do not deny having actual notice of that order. Furthermore, the Attorneys knew, at least as far back as 1996, when the government sought to depose them, that the government was attempting to recover those fees.

Finally, the initial forfeiture motion filed by the government was accompanied by a claim that the fees in question should be disgorged because their payment violated the Protective Order, a claim virtually identical to the civil contempt claim.

Consequently, any hardship arising from the fact that the Attorneys may have chosen to spend the money transferred to them in violation of the Protective Order is self-inflicted and does not insulate them from the consequences of that violation.

## II. Contempt

A court has the inherent authority to enforce its lawful orders through contempt proceedings. *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). In a civil contempt proceeding, sanctions may be imposed in order to compel compliance and/or to compensate a party harmed by noncompliance. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949) ("Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance."); *see also McGregor v. Chierico*, 206 F.3d 1378, 1385 (11th Cir.2000) ("In civil contempt proceedings, a party guilty of contempt may be required to compensate those injured by its contempt."); *United States v. Marquardo*, 149 F.3d 36, 40 (1st Cir.1998) (payment of civil contempt fines by one

party to another not only forces obedience, but also remedies the harm caused by noncompliance). In criminal contempt proceedings, on the other hand, sanctions are imposed to punish noncompliance and to deter others from disregarding court orders. *Shillitani*, 384 U.S. at 370 n. 5, 86 S.Ct. 1531.

Civil and criminal contempt also are distinguishable by the state of mind that is required. Willfulness is an element of criminal contempt, but not civil contempt. *United States v. Mourad*, 289 F.3d 174, 180 (1st Cir.2002); *In re General Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995). Thus criminal contempt requires a showing that the contumacious act was committed deliberately and with knowledge that it violated a court order rather than inadvertently or negligently. *United States v. Marquardo*, 149 F.3d at 43 n. 4 (1st Cir.1998) (willfulness is the knowledge that one is violating a court order, not that the violation of the order is a crime); *United States v. Cutler*, 58 F.3d 825, 837 (2d Cir.1995); *Landmark Legal Foundation v. E.P.A.*, 272 F.Supp.2d 70, 76 (D.D.C.2003). By contrast, in the case of civil contempt, specific intent to violate the order is not required. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949) ("Since the purpose [of civil contempt] is remedial, it matters not with what intent the defendant did the prohibited act."); *Landmark*, 272 F.Supp.2d at 76 ("For purposes of civil contempt, 'the intent of the recalcitrant party is irrelevant.' ") (quoting *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1184 (D.C.Cir.1981)); *Food Lion, Inc. v. United Food and Commercial Workers Int'l Union AFL–CIO–CLC*, 103 F.3d 1007, 1017 (D.C.Cir.1997) ("[A] finding of bad faith on the part of the contemnor is not required."); *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 128 n. 2 (2d

Cir.1979) ("The fact that the prohibited act was done inadvertently or in good faith, however, does not preclude a citation for civil contempt, for the sanction is remedial in nature."); *Select Creations, Inc. v. Paliafito America, Inc.*, 906 F.Supp. 1251, 1272 (E.D.Wis.1995) ("[A] civil contempt may be established even though the failure to comply with the Court's order was unintentional or done with good intentions").

In order to prevail on its civil contempt claim, the government must prove by clear and convincing evidence that:

1. The Attorneys had notice of the Protective Order;

2. The order was clear, definite and unambiguous;

3. The Attorneys had the ability to comply with the order; and

4. The Attorneys violated the order.

*See McGregor v. Chierico*, 206 F.3d at 1383; *see also AccuSoft Corp. v. Palo*, 237 F.3d 31, 47 (1st Cir.2001); *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir.1991).

Proof by "clear and convincing evidence" means proof that it is "highly probable" that the facts alleged are true. *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984).

### A. *Notice of the Order*

 A person cannot be held in contempt for failing to comply with a court order unless that person has notice of the order and its terms. *Project B.A.S.I.C.*, 947 F.2d at 17; *Perfect Fit Indus. v. Acme Quilting Co.*, 646 F.2d 800, 808 (2d Cir. 1981) ("It is indeed well settled that a person cannot be held in contempt of an order if he does not have knowledge of the order.")

 Ordinarily, actual notice is required. *See Quinter v. Volkswagen of America*, 676 F.2d 969, 973 (3d Cir.1982) ("A person is liable for civil contempt if he violates a court order with actual notice that the order has been issued." (quoting *Thompson v. Johnson*, 410 F.Supp. 633, 640 (E.D.Pa.1976))); *Panix Promotions Ltd. v. Lewis*, No. 01 Civ. 2709, 2004 WL 421937 at *4 (S.D.N.Y. March 5, 2004) (finding no civil contempt where it was unclear whether there was actual notice of the injunction). However, one may not avoid contempt by maintaining a "studied ignorance" of an order. *Perfect Fit Indus.*, 646 F.2d at 808. Therefore, since a party to litigation has a duty to monitor the progress of litigation and to ascertain the terms of any orders entered, that party may be held in contempt for violating one of those orders even if it claims not to have had actual notice. *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (rejecting defendant's explanation for delayed compliance with decree based on lack of notice where order was published in law journal); *Perfect Fit*, 646 F.2d at 808; *see also New York State Nat'l Org. of Women v. Terry*, 697 F.Supp. 1324, 1332 n. 9 (S.D.N.Y.1988).

In any event, personal service is not required to establish notice. *Vuitton*, 592 F.2d at 129 (personal service of injunction not required so long as those to be held in contempt had actual notice of the decree). Moreover, although constructive notice, *per se*, is not sufficient, it may constitute circumstantial evidence of actual notice. *King*, 65 F.3d at 1058.

In this case, the Attorneys, to their credit, do not deny knowing of the Protective Order when the fees in question were paid. Even if they did, as Saccoccia's trial counsel, they had a duty to monitor the progress of the litigation and ascertain the terms of all orders entered. Consequently, the notice requirement has been satisfied.

### B. *Clarity of the Protective Order*

One may not be held in contempt for violating a court order unless the order clearly and unambiguously describes the kind of conduct that is required or forbidden. *NBA Properties, Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir.1990). Any ambiguities must be construed in favor of an alleged contemnor. *AccuSoft*, 237 F.3d at 47; *Project B.A.S.I.C.*, 947 F.2d at 16.

The Attorneys argue that the Protective Order is not "clear and unambiguous" because it was impossible for them to determine whether a particular one hundred dollar bill paid to them as part of their fees came from the "$140 million in U.S. currency for which the defendants ... [were] jointly and severally liable." That argument lacks merit.

The Attorneys appear to rely on what some courts have referred to as the "four corners" rule which states that prohibited conduct must be ascertainable from the "four corners" of the order. *Dystar Corp. v. Canto*, 1 F.Supp.2d 48, 54 (D.Mass.1997) (quoting *King*, 65 F.3d at 1058). However, that reliance is misplaced. The "four corners" rule simply requires that the prohibited conduct be clearly described in the order itself. In this case, the Protective Order does clearly describe the prohibited conduct. It specifically enjoins the transfer of the "$140,000,000 in U.S. currency for which the defendants are jointly and severally liable."

What the Attorneys really are arguing is that they lacked the ability to comply with the Protective Order because they had no way of determining whether the fees they received were derived from the $140,000,000 in money laundering proceeds.

### C. *Ability to Comply with the Order*

As explained in this Court's July 31, 2001, Memorandum and Order, when the fees in question were paid, Saccoccia had been convicted and it was clear that virtually all of his assets were proceeds of his money laundering activities. 165 F. Supp 2d at 111–113. That finding was based, in part, on evidence that Saccoccia's "legitimate businesses" were not profitable and served primarily as "fronts" for the defendants' money laundering activities. The finding that the fees paid to the Attorneys were part of the proceeds was buttressed by the suspicious circumstances under which the fees were paid. Some payments were in the form of wire transfers from Switzerland, where Saccoccia had secreted some of his assets, and others consisted of large amounts of cash delivered by anonymous individuals. *See id.*

Consequently, there was no need for the Attorneys to distinguish one $100 bill from another in order to determine whether the fees that they received were part of the $140 Million that was the subject of the Protective Order. Once Saccoccia was convicted, it was readily apparent that all of the amounts being paid to the Attorneys "constituted or were derived from the proceeds of the Saccoccias' racketeering conspiracy," *id.* at 111.

Since the Attorneys obviously could have refrained from accepting fees from Saccoccia after he was convicted, they had the ability to comply with the Protective Order.

### D. *Violation of the Order*

Because there is no question that the fees at issue were part of the $140,000,000 referred to in the Protective Order, there can be no question that acceptance of these fees was a violation of the Order.

### Conclusion

For all the foregoing reasons, the government's motion is granted: Hill is hereby ordered to disgorge $254,985 of the fees

paid to him and O'Donnell is hereby ordered to disgorge $42,500 of the fees paid to him.

IT IS SO ORDERED.