# United States Court of Appeals
## For the First Circuit

---

No. 04-2669

UNITED STATES OF AMERICA,

Appellee,

v.

STEPHEN A. SACCOCCIA,

Defendant,

JACK HILL, ESQ., and W. KENNETH O'DONNELL, ESQ.,

Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, Chief U.S. District Judge]

---

Before

Boudin, Chief Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

W. Kenneth O'Donnell for appellants.
Michael P. Iannotti, Assistant United States Attorney, with whom Robert Clark Corrente, United States Attorney, and Michael E. Davitt and Patrick Murphy, Asset Forfeiture and Money Laundering Section, United States Department of Justice, were on brief, for appellee.

---

December 23, 2005

---

**LYNCH**, **Circuit Judge**.  This case presents the question of whether appellants, a pair of criminal defense attorneys, committed civil contempt when they accepted legal fees from their client in the face of an earlier protective order restraining the defendant client from disbursing certain assets.

The appellants, attorneys Jack Hill and W. Kenneth O'Donnell, began representing the client, Stephen Saccoccia, in 1991 and 1992, respectively.  Saccoccia and his co-defendants were convicted in 1992 and 1993 in separate trials; their appeals from the criminal convictions were resolved against them in 1995.

The government first sought in 1998 to recover virtually all of the fees paid to counsel.  The government did not at that time pursue a contempt theory; instead, it sought to reach the sums paid to the lawyers both before and after trial as forfeited funds under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq.  The district court rejected the government's forfeiture claim as to fees paid before the jury's verdict of conviction.  It allowed the claims for fees paid after the jury verdict but before entry of the judgment of conviction -- an approximately three-month span in 1993.

This court vacated the order as to the post-verdict fees. The government then tried again, via a motion filed in 2004, to obtain an award of the post-verdict fees, this time utilizing a

-2-

civil contempt theory.  The district court again agreed and ordered the defense lawyers to turn over these fees to the government.

We reverse.  We find that the Protective Order at issue in this case did not clearly and unambiguously enjoin Hill and O'Donnell from accepting the attorneys' fees in question, and so the civil contempt finding cannot stand.

**I.**

**A.  The Indictment, Protective Order, and Trial**

In 1991, Saccoccia, his wife, and a host of other defendants were indicted for crimes arising out of a scheme to launder $140 million in illegal drug distribution proceeds.[1]  See United States v. Saccoccia (Saccoccia V), 342 F. Supp. 2d 25, 27 (D.R.I. 2004).  Saccoccia, his wife, and several of the other defendants were charged with, inter alia, one count of RICO conspiracy.  See United States v. Saccoccia (Saccoccia IV), 354 F.3d 9, 11 (1st Cir. 2003).  The indictment contained a forfeiture count for the defendants' interests in various assets; these included named bank accounts, business property and proceeds (including gold and jewelry), and "$140,000,000 in U.S. currency in that such sum in the aggregate represents the proceeds the said defendants obtained directly and indirectly from the racketeering activity."

_____

[1]  A superseding indictment was returned on July 22, 1992.

-3-

Four days after the initial indictment was returned, the district court, pursuant to 18 U.S.C. § 1963(d)(1)(A),[2] entered an <u>ex parte</u> Protective Order ("the Order") enjoining Saccoccia and the other defendants, and their agents and attorneys, from transferring assets that the government alleged would be forfeitable upon conviction.  <u>See</u> <u>Saccoccia V</u>, 342 F. Supp. 2d at 27.  The interpretation of that Order is at issue in this case.  The Order banned the transfer of specific assets, such as certain bank accounts.  It also stated that Saccoccia and his agents, attorneys and others, "shall not, without approval of this Court . . . alienate, dissipate, [or] transfer . . . or . . . take, or cause to be taken, any action which . . . would have the effect of . . . in any way diminishing the value of any property named in Attachment A to this Order."  Attachment A includes among the named property the following: "$140,000,000 in U.S. currency for which the defendants . . . are jointly and severally liable."

Saccoccia's attorneys were concerned from the outset about whether any attorneys' fees paid by Saccoccia would be subject to forfeiture.  In early 1992, shortly after Saccoccia was

---

[2]  This provision authorizes the court to enter a restraining order or injunction "to preserve the availability of property described in [the criminal forfeiture provision, § 1963(a)] . . . upon the filing of an indictment or information" charging a RICO violation and "alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture."  18 U.S.C. § 1963(d)(1)(A).

indicted, appellant Hill and another attorney met with Assistant United States Attorneys (AUSAs) James Leavey and Michael Davitt and asked them about their office's policy regarding forfeiture of the fees paid to defense attorneys. See United States v. Saccoccia (Saccoccia III), 165 F. Supp. 2d 103, 106 (D.R.I. 2001), aff'd in part, vacated in part, 354 F.3d 9 (1st Cir. 2003). Leavey told them that the U.S. Attorney's Office in Rhode Island had never sought to forfeit reasonable fees paid to attorneys. Id. Specifically, Hill testified that Leavey said "that he and the Government in Rhode Island had never done that. It was not their policy to do that, and . . . they did not intend to do that, subject to the caveat of reasonableness, in terms that monies received were reasonable, in light of the services rendered and expenses and so forth." However, Leavey testified at a 1999 forfeiture hearing that he also told the two defense attorneys that day that "this case may be the first one" where a forfeiture of reasonable attorneys' fees would be sought.

A couple of weeks later, Hill and the other attorney again met with Leavey, this time to discuss the possibility of a plea agreement for Saccoccia. Id. Leavey stated during that discussion that if the parties reached agreement on a plea, Leavey would include in the written plea agreement a provision that the government would not seek forfeiture of reasonable attorneys' fees. Id.

Later, in the fall of 1992, appellant O'Donnell told Leavey that he, too, might represent Saccoccia and asked about the government's forfeiture policy. Id. Leavey essentially repeated what he had told Hill, stating to O'Donnell that the U.S. Attorney's Office in Rhode Island had never sought to forfeit reasonable attorneys' fees. Id. O'Donnell later testified that Leavey told him during that conversation "that [Leavey] was aware that there were other assets out there that hadn't been specifically frozen, and [Leavey] essentially said that . . . if you find . . . an asset which isn't frozen, you can have it for attorney's fees, as long as it's reasonable and as long as none of it goes to Saccoccia or his wife." O'Donnell also testified that Leavey's assurances -- that his office had never sought forfeiture of fees and had no intention of doing so in this case -- were reiterated to him by the then-U.S. Attorney for the District of Rhode Island during a telephone call shortly after O'Donnell's conversation with Leavey.[3]

On September 28, 1992, during a hearing before the district court,[4] attorneys for Saccoccia and other defendants

_____

[3] In a later conversation, on April 5, 1996, Leavey told O'Donnell that his office "did not intend to move to forfeit his legal fee" but would do so if "[then-Attorney General] Janet Reno said to do it."

[4] The district judge who presided over this hearing, Saccoccia's subsequent trial, and the forfeiture and contempt litigation is not the same judge who had entered the Protective Order.

argued in support of their motions to compel the government to reveal precisely which of Saccoccia's assets it had frozen, and upon what authority, so that defense counsel could look to any unfrozen accounts for legal fees and defense costs. During that hearing, an attorney representing Mrs. Saccoccia suggested that there was a "race for the proceeds" developing between the government and defense counsel; he told the court that he had at one point called AUSA Leavey to tell him about an unfrozen account in Switzerland and Leavey replied, "don't tell me because if you tell me I am going to have to go get it." AUSA Leavey argued in response that the government should not be forced to specify the frozen accounts for the defense because that would give Saccoccia "free rein to go to all the other accounts that he has," if he had any at all. He suggested that the defense should instead give the government a list of all of Saccoccia's assets, and the government would then tell the defense which (if any) were unfrozen. Later in the hearing, he characterized the government's position as: "[G]ive us assets of a hundred and forty million dollars and everything over that is yours for legal counsel."

The district court denied the defense motions. In so doing, it noted its understanding that "the Government cannot deprive a criminal Defendant of his only assets available for attorneys' fees without any showing that the assets are connected to illegal activity." However, it said that that was not the

situation before the court.  The main legal precedent the defense team cited for its position was distinguishable, the court said, because in that case,

> the Government had left the Defendant with nothing but the shirt on his back.  So that, in effect, what the Government had done was taken all of the assets of the Defendant and left the Defendant unable to pay counsel.
>
> There's been no such showing in this case. . . . It would seem to the Court that the minimum . . . that the Defendants would have to present . . . to the Court [is something] to indicate that the tying up of their assets is depriving them of funds needed to conduct their defense and that is lacking.

Saccoccia eventually went to trial; on March 12, 1993, the jury found him guilty of one count of RICO conspiracy, as well as numerous substantive (i.e. non-conspiracy-based) counts of money laundering and related offenses under 18 U.S.C. §§ 1952, 1956, and 1957.  The jury determined, as part of its finding as to the substantive counts, that Saccoccia had laundered $9,382,757.  However, it did not make any finding as to RICO forfeiture; Saccoccia waived jury trial on that issue, and no finding was made as to RICO forfeiture prior to sentencing.  See United States v. Saccoccia (Saccoccia I), 823 F. Supp. 994, 997 & n.1 (D.R.I. 1993), aff'd, 58 F.3d 754 (1st Cir. 1995).

The district court sentenced Saccoccia on May 12, 1993,[5] to a 660-year term of imprisonment and a fine in excess of $15 million; the court also, pursuant to RICO, ordered Saccoccia to forfeit in excess of $136 million. On June 4, 1993, the court issued a written opinion explaining its forfeiture conclusion and reiterating that Saccoccia had to forfeit more than $136 million. Id. at 1006. Judgment of conviction entered on June 10, 1993; the conviction, sentence, fine, and forfeiture were affirmed on appeal in 1995. United States v. Saccoccia (Saccoccia II), 58 F.3d 754 (1st Cir. 1995).

**B. The Fees**

The issues on appeal, more than twelve years after Saccoccia's conviction, concern the fees received by his attorneys in the period between the jury verdict on March 12, 1993, and the imposition of sentence, opinion on forfeiture, and judgment of conviction, on May 12, June 4, and June 10, 1993, respectively. In an earlier proceeding (discussed further below), the district court found that appellant Hill received a total of $504,985 in fees. Saccoccia III, 165 F. Supp. 2d at 107. Of that total, Hill received $250,000 before the jury verdict against Saccoccia, while "[t]he remaining $254,985 was received on March 25, 1993." Id. It is this $254,985 which is still at issue as to Hill. All but

---

[5] The government stated in its brief that sentence was imposed on May 18, not May 12. We use the date set forth in the records of the district court.

$25,000 of Hill's total fee was paid in the form of checks or wire transfers from a Swiss attorney, Valentin Landman; the payments ranged in size from $20,000 to $229,985. Id. The remaining $25,000 was delivered, in cash, to appellant O'Donnell's office. Id. The date of this cash transfer is not clear; O'Donnell stated in a deposition that it was "between February 17 and March" of 1993, but could not provide a more exact date.

O'Donnell, meanwhile, was also receiving payment of his own fees. The district court found that "[b]etween January 1993 and April 1993, O'Donnell received approximately $410,000. One hundred twenty-five thousand dollars of that amount was delivered anonymously to his office in cash installments ranging from $25,000 to $50,000." Id. The court found that O'Donnell kept $107,500 of the total as payment for his fees, while the rest was given to him for distribution to co-defense attorneys and others. Id. O'Donnell received $65,000 of his total fee before Saccoccia was found guilty and the remaining $42,500 in the weeks after the jury verdict. Id. As to O'Donnell, it is the $42,500 which the government now seeks to recover.

During an August 11, 1999 hearing, O'Donnell testified that various gold and jewelry merchants in Rhode Island and Massachusetts had told him, before Saccoccia's trial, that they had done legitimate business with Saccoccia over the years and that they had records to prove it. O'Donnell also testified that he was

-10-

told by Saccoccia that some of the monies the defense attorneys received as fees were the proceeds of loans Saccoccia had made earlier that were being repaid by the debtors, while other funds used for attorneys' fees stemmed from loans made <u>to</u> Saccoccia by others. Specifically, O'Donnell testified that Saccoccia said one of the payments consisted of the proceeds of a loan Saccoccia had made that had nothing to do with illegality but instead stemmed from "his other businesses." O'Donnell also stated that Saccoccia told him "on several occasions" that a large sum of money that had been wired to defense counsel from Switzerland for fees stemmed from funds loaned to Saccoccia by "an individual and a bank." He further testified that he had seen documents that "appeared . . . to be loan documents, promissory notes" bearing Saccoccia's signature, which confirmed for him that the latter payments were indeed loan proceeds. He stated: "Loan proceeds that never touched the Saccoccia's [sic] hands are not covered by that [protective] order, I would think. Accounts receivable owed to him that . . . never touched his hands and were never in his possession aren't encompassed by that order either."

## C.  The First Proceeding for Forfeiture of Attorneys' Fees

After the defense attorneys had received the disputed funds but before the filing of any motion seeking a return of fees on grounds of forfeiture, the government sought leave in August

1993, pursuant to 18 U.S.C. § 1963(k),[6] to depose various defense attorneys, including appellants, on the subject of their legal fees and Saccoccia's assets generally. At a February 18, 1994, hearing on the application, the district court asked AUSA Leavey whether the purpose of deposing the attorneys to learn about their fees was to forfeit them. Leavey replied:

> The purpose at this point, Your Honor, would be to locate the money that [Saccoccia] now has and to seize them [sic] to satisfy the judgment. If there is a next step after that, in going after attorneys' fees that he has already paid the attorneys, we are not at that stage at this point.

The district court granted the government's § 1963(k) application on August 28, 1995; pursuant to that order, Hill and O'Donnell were deposed on March 28 and 29, 1996.

The government filed a motion on January 23, 1998, based on the deposition testimony and evidence from the criminal trials, seeking to compel Hill, O'Donnell, and several other defense attorneys involved in the Saccoccia case to turn over their fees. Specifically, the government sought the return of $504,985 from Hill and $107,500 from O'Donnell. It argued that the fees were forfeitable under 18 U.S.C. § 1963(c), which applies to "proceeds" of a RICO conspiracy that have been transferred by a defendant to another person, or § 1963(m), which makes other property of a

---

[6]  Section 1963(k) permits the court, upon application of the United States, to "order that the testimony of any witness relating to the property forfeited be taken by deposition."

defendant forfeitable as "substitute assets" when the "proceeds" cannot be located.  See Saccoccia III, 165 F. Supp. 2d at 105.  Alternatively, the government argued that if the fees were not forfeitable under § 1963(c) or (m), they were forfeitable nonetheless because they had been transferred in violation of the Order.  Id.  This was purely a statutory RICO forfeiture argument and not a contempt argument.  Id. at 114.

On July 31, 2001, the district court issued its decision, finding for the government in part and ordering Hill and O'Donnell to disgorge $254,985 and $42,500, respectively.  Id.  Those were the amounts, the district court found, that Hill and O'Donnell had received after the March 1993 jury verdict against Saccoccia.  It reasoned that prior to the verdict, Hill and O'Donnell were "reasonably without cause to believe" the money used to pay them was subject to forfeiture, 18 U.S.C. § 1963(c), and therefore even though the funds were in fact proceeds of money laundering violations, they were not forfeitable under § 1963(c).  Saccoccia III, 165 F. Supp. 2d at 111-12.  The same result did not obtain for post-verdict fees, the court held, because "[a]t that point, there no longer was any reasonable doubt about the Saccoccias' guilt, and it had become clear that virtually all of their assets were proceeds of their RICO violations."  Id. (emphasis added).

The district court rejected the government's alternative argument that all the fees, including pre-jury verdict payments,

-13-

had to be disgorged because their acceptance violated the Order. It wrote that the argument "does not withstand scrutiny." Id. at 113. The court explained:

> The mere fact that an order is entered enjoining the transfer of property does not make the property forfeitable. Nor does the property become forfeitable solely because it is transferred in violation of such an order. If that were so, property described in or transferred in violation of such an order would become forfeitable even if it, later, was determined not to be "property described in subsection (a) [of 18 U.S.C. § 1963]." Such legal alchemy would violate the plain language of subsection (d)(1).

Id. at 113-14 (quoting 18 U.S.C. § 1963(d)(1)).

Hill and O'Donnell appealed, arguing that the district court's order was improper because they had already spent the post-verdict fees in question. Saccoccia IV, 354 F.3d at 12. This court agreed, holding that the "substitute assets" provision, 18 U.S.C. § 1963(m), "plainly does not afford an avenue through which the government may reach a third party's untainted assets as a substitute for tainted assets which the third party had already transferred prior to the date of forfeiture." Saccoccia IV, 354 F.3d at 13. We vacated the portion of the district court's decision requiring Hill and O'Donnell to forfeit their post-verdict fees and remanded for further proceedings. Id. at 15-16.

**D. The Attempt to Recover Fees on a Civil Contempt Theory**

On February 5, 2004, in the wake of this court's decision in Saccoccia IV, the government filed a motion seeking to compel

-14-

Hill and O'Donnell to turn over the money still at issue -- the $254,985 received by Hill and the $42,500 received by O'Donnell after March 12, 1993 -- on the ground that, in accepting those fees, the attorneys had committed civil contempt by violating the 1991 Protective Order. The district court accepted this argument: on October 25, 2004, it found Hill and O'Donnell in contempt and ordered that they disgorge the post-verdict fees. Saccoccia V, 342 F. Supp. 2d at 32-33.

In its decision, the district court examined whether the government had established, by clear and convincing evidence, that the attorneys had engaged in civil contempt. It utilized the usual civil contempt inquiry: (1) whether the alleged contemnor had notice of the order; (2) whether the order was clear, definite, and unambiguous; (3) whether the alleged contemnor had the ability to comply with the order; and (4) whether the alleged contemnor violated the order. Id. at 30-32. There was no doubt that the attorneys had notice of the Order. Id. at 31. As to prong (2), Hill and O'Donnell had argued that the Order was unclear, inter alia, "because it was impossible for them to determine whether a particular one hundred dollar bill paid to them as part of their fees" came from the specific $140 million in U.S. currency that had been enjoined. Id. at 32. The district court rejected this argument, writing:

> [Hill and O'Donnell] appear to rely on what
> some courts have referred to as the "four

corners" rule which states that prohibited conduct must be ascertainable from the "four corners" of the order. However, that reliance is misplaced. The "four corners" rule simply requires that the prohibited conduct be clearly described in the order itself. In this case, the Protective Order does clearly describe the prohibited conduct. It specifically enjoins the transfer of the "$140,000,000 in U.S. currency for which the defendants are jointly and severally liable."

Id. (citation omitted). The court found that the attorneys could have complied with the Order by simply refusing to accept post-verdict fees. Id. Finally, the court found that the Order had been violated because "there is no question that the fees at issue were part of the $140,000,000 referred to in the Protective Order." Id.

Hill and O'Donnell timely appealed.[7]

**II**.

In civil contempt cases, we first look to the text of the order to determine whether it is clear. As to findings of fact, we

---

[7]    On appeal, Hill and O'Donnell renew their argument, rejected by the district court, that the government's motion was barred by laches and take issue with many of the district court's findings of fact and conclusions as to civil contempt. Because of our disposition of this case, we need only address appellants' contention that the district court erred in finding that the Order was "clear and unambiguous" in barring their acceptance of fees.
     Hill and O'Donnell also challenge the jurisdiction of the district court, and this court, on the grounds that (1) the district court lost the authority to enforce the Order at the time of judgment in Saccoccia's criminal case, and (2) alternatively, a four-year statute of limitations should apply to civil contempt motions. We find these arguments meritless and do not discuss them further.

-16-

review for clear error, while "[t]he trial court's ultimate finding on contempt is reviewed for abuse of discretion." Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 15-16 (1st Cir. 1991). Importantly, though, "our review will proceed more searchingly when, as here, we are confronted with a finding of contempt than when we are called upon to consider a finding exonerating a putative contemnor from a charged contempt." Id. at 16.

## A. Substantive Principles of Civil Contempt

Civil contempt may be imposed to compel compliance with a court order or to compensate a party harmed by non-compliance. McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949). However, "[r]ecognizing the contempt power's virility and damage potential, courts have created a number of prudential principles designed to oversee its deployment." Project B.A.S.I.C., 947 F.2d at 16. As the district court properly noted, the proof must establish (1) that the alleged contemnor had notice that he was "within the order's ambit," id. at 17; (2) that the order was "clear and unambiguous," e.g., Accusoft Corp. v. Palo, 237 F.3d 31, 47 (1st Cir. 2001) (quoting Project B.A.S.I.C., 947 F.2d at 16); (3) that the alleged contemnor had the ability to comply, see United States v. Rylander, 460 U.S. 752, 757 (1983) (stating that "where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action"); and (4) that the order was indeed violated, Project B.A.S.I.C., 947

-17-

F.2d at 16.  This court has sometimes combined the related "clear and unambiguous" and violation prongs, asking whether "the putative contemnor has violated an order that is clear and unambiguous." Id.  When the question turns on findings of fact, "a complainant must prove civil contempt by clear and convincing evidence."  Id. (internal quotation marks omitted) (quoting Langton v. Johnston, 928 F.2d 1206, 1220 (1st Cir. 1991)).

We focus on the "clear and unambiguous" prong together with the violation prong.  This court has, over the years, provided guidance as to how the "clear and unambiguous" requirement should be analyzed.  First, "[t]he test is whether the putative contemnor is 'able to ascertain from the four corners of the order precisely what acts are forbidden.'"  Goya Foods, Inc. v. Wallack Mgmt. Co., 290 F.3d 63, 76 (1st Cir. 2002) (quoting Gilday v. Dubois, 124 F.3d 277, 282 (1st Cir. 1997)).  The purpose of this "four corners" rule is to assist the potential contemnor by narrowly cabining the circumstances in which contempt may be found.  It is because "[t]he consequences that attend the violation of a court order are potentially dire," Project B.A.S.I.C., 947 F.2d at 17, that "courts must 'read court decrees to mean rather precisely what they say,'" id. (quoting NBA Properties, Inc. v. Gold, 895 F.2d 30, 32 (1st Cir. 1990)).  As the Supreme Court has written:

> The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by

-18-

> requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.

Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76 (1967) (identifying the specificity requirements of Fed. R. Civ. P. 65(d) as relevant to certain contempt inquiries); see also Sanders v. Air Line Pilots Ass'n, Int'l, 473 F.2d 244, 247 (2d Cir. 1972). Along the same lines, "we must read any ambiguities or omissions in . . . a court order as redound[ing] to the benefit of the person charged with contempt." NBA Properties, 895 F.2d at 32 (second alteration in original) (internal quotation marks and citation omitted).

Finally, if the "clear and unambiguous" test is to have any content, it cannot be applied in the abstract. The question is not whether the order is clearly worded as a general matter; instead, the "clear and unambiguous" prong requires that the words of the court's order have clearly and unambiguously forbidden the precise conduct on which the contempt allegation is based. See Perez v. Danbury Hosp., 347 F.3d 419, 424 (2d Cir. 2003) (rejecting district court's finding that an order was clear and unambiguous where the district court "appeared to rule in a vacuum and failed to evaluate whether the order was 'clear and unambiguous' with reference to the conduct in question"). The Order in this case, therefore, must have "left no reasonable doubt" that an attorney would be violating its terms were that attorney to accept the post-

-19-

guilty verdict attorneys' fees in question.  Project B.A.S.I.C.,
947 F.2d at 17.

## B.  Application of the Civil Contempt Requirements

We discuss two questions -- first, the meaning of the
Order, and second, the adequacy of the evidence to show that the
payments came out of assets restricted by the Order.  The two
issues are interconnected.  The clarity of the Order is judged in
connection with the facts presented.  Here, as we discuss, the
Order does not say that all of Saccoccia's assets are restricted,
nor does it say that all assets received from Saccoccia become
restricted on a finding of guilt.  As to the evidence, the
government did not prove that these particular payments to the
attorneys came out of restricted assets.

1. The Order's Text and Context

The relevant portion of the Order[8] states that it barred
Saccoccia and his attorneys from alienating, dissipating, or
transferring  "$140,000,000  in  U.S.  currency  for  which  the
defendants . . . are jointly and severally liable."

It is true that the purpose of the Order was to preserve
assets so that they would be available for later forfeiture should
the government prevail on its forfeiture claim.  Beyond that,

_____

[8]  The Order also contained a number of specific injunctions as to
bank accounts, gold, and other assets.  We focus on the $140
million provision because the government and the district court
relied on it.  See Saccoccia V, 342 F. Supp. 2d at 32.

-20-

however, the exact relationship between the forfeiture laws and the Order was not specified.  More fundamentally, we think that the Order did not clearly establish that there were no assets from which fees could be paid.

The phrase "$140,000,000 in U.S. currency" does not itself identify assets or state whether it is inclusive of all assets belonging to Saccoccia.  Further, the Order did not itself distinguish between tainted and substitute assets; it instead referred only to assets "for which [Saccoccia is] jointly and severally liable."  A reasonable person, reading the Order in 1993, could have had legitimate doubts as to whether it restrained any "substitute assets," as defined by 18 U.S.C. § 1963(m).  Indeed, that year, several courts held that such substitute assets may not be restrained prior to conviction.  See, e.g., In re Assets of Martin, 1 F.3d 1351, 1362 (3d Cir. 1993) (holding that 18 U.S.C. § 1963(d)(1)(A) does not authorize pre-conviction restraints on substitute assets).[9]

_____

[9]  The fact that appellants accepted fees in the face of an unclear Order does not run afoul of the different rule that where an order is by its terms clear and unambiguous, a party's subjective doubt about the order's scope or effectiveness does not render the order ambiguous.  See Goya, 290 F.3d at 75-76 ("[T]he appellants could have asked the district court for clarification as to the enduring vitality of the November 1995 orders, but . . . [t]hey chose instead to rely on their own judgment as to whether the orders remained in effect. In so doing, the appellants acted at their peril.").  Here the Order itself was unclear.

-21-

Thus the Order, when issued, could have been interpreted in various ways. It could have meant that the court believed that all of Saccoccia's assets were tainted and that none could be used to pay attorneys' fees; but it did not say that expressly or even impliedly. It could have meant that at least $140 million in assets had to be preserved for the government, and that any party, including a lawyer, seeking payment of any kind from the Saccoccia coffers had to satisfy the court that he was being paid from the unprotected excess or would risk losing the assets. But it did not expressly say that either. It also could have been read to mean that the government had the right to identify up to $140 million in tainted assets that would be frozen, but also bore the burden of making specific identifications, leaving any of Saccoccia's assets not yet so identified presumed untainted and therefore freely transferable.

Context further reinforces that there was ambiguity about what the Order required and what it did not. It is entirely consistent with the four corners rule (which is meant to protect alleged contemnors) to look at context offered by the alleged contemnors to demonstrate that there was ambiguity in the terms of the Order. See Danbury Hosp., 347 F.3d at 424-25 (applying four corners rule and noting that the district court had previously expressed an understanding of a consent decree that would not have prohibited appellants' conduct and considering that fact in its

"clear and unambiguous" analysis).  Early on, Hill and O'Donnell requested clarification from the government, via the district court, as to which of Saccoccia's assets could be used to pay attorneys' fees.  At the 1992 hearing, the district court found there had been no showing that the government had "taken all of the assets of the Defendant and left the Defendant unable to pay counsel."[10]  If the district court had understood the Order to block all payment of attorneys' fees from whatever source, one would not have expected it to make such a statement.

In summary, the Order's text did not clearly state that it covered all of Saccoccia's assets.  Only six months before the payments at issue, there was no clear understanding that all of Saccoccia's assets were in fact covered or that there were no assets from which reasonable attorneys' fees could be paid.  Defense counsel's efforts to obtain clarity had been rebuffed; moreover, the district court had commented that the government could not deprive Saccoccia of his only assets for paying attorneys' fees without a showing that the assets were connected to illegal activity.

---

[10]  The government added to the bevy of contradictory signals.  For example, the AUSA would, understandably, not commit on whether the government would ever seek forfeiture of attorneys' fees, even from the Protective Order funds, and on whether, in any event, there were funds available outside the Protective Order.

As discussed next, the government failed to produce evidence demonstrating that the payments were within the activities expressly forbidden by the Order.

2. The Government's Approach

The district court reasoned that any ambiguities that existed at the time the Order was entered were resolved by the evidence adduced at trial and by the jury verdict. Essentially, the court accepted the government's position that after the verdict, and even before entry of judgment of conviction, it was perfectly clear that (1) all of Saccoccia's assets were subject to the Order, (2) the payments received in this period came from Saccoccia's assets, and so necessarily came from assets subject to the Order, and (3) acceptance of these particular assets violated the Order.

The district court's ruling may reflect a sort of common-sense judgment that by the time the verdict of guilt was delivered, it was clear that there was little chance Saccoccia would have any funds to pay his lawyers after paying off the inevitable forfeiture of funds, and that the lawyers should have had less confidence in accepting the payments once the guilty verdict was rendered. These are not unreasonable assumptions. The government chose to proceed under a contempt theory, however, and the law of civil contempt requires much more precision. And that rationale is ill-suited to

the language of the Order.  The government's evidence does not show that the terms of the Order were violated.

The jury made no determination as to the amount Saccoccia was required to forfeit pursuant to RICO, or as to the provenance of particular funds, or as to the total amount of Saccoccia's assets.  It simply returned a general verdict of guilt as to the RICO charge, leaving it to the judge to make findings of fact as to forfeiture at sentencing.  The payments at issue here came before the court made those findings of fact.

Further, even the district court's June 4, 1993 opinion regarding forfeiture did not find that all of Saccoccia's assets stemmed from money laundering.  See generally Saccoccia I, 823 F. Supp. 994.  In fact, no fact-finder has ever reached such a conclusion; even in its much later decision as to fee forfeiture under the RICO statute, the district court found only that "virtually all of [Saccoccia's] assets were proceeds of [his] RICO violations."  Saccoccia III, 165 F. Supp. 2d at 112 (emphasis added); see also id. at 111 (finding that Saccoccia's businesses were "not particularly profitable" and that they were "primarily" fronts for money laundering).

Given its choice of a contempt theory, the government had the burden of proof to show, by clear and convincing evidence, that the attorneys' acceptance of post-jury verdict fees fell within the list of activities expressly forbidden by the Order.  Based on this

record, the government, which presented no new evidence in support of its contempt motion but instead relied on the record and the district court's prior findings, failed to carry that burden.

### III.

The fact that this case involves attorneys' fees rather than payments for other purposes gives the lawyers no advantage. Fees paid to attorneys from the criminal proceeds of their clients are not held sacred. They may be reached by the government, and Congress, under RICO, has set clear parameters for the forfeiture of attorneys' fees. See generally Caplin & Drysdale, Chartered v. United States, 491 U.S. 617 (1989). This case does not involve the use of those RICO procedures. Rather, the principles involved here are of civil contempt, a serious sanction requiring unmistakably clear notice to the person involved of what is required. Those standards were not met here.

We reverse the district court's order of contempt and remand for entry of judgment for appellants. No costs are awarded.

**Reversed**.