Lillian REYNOLDS and Michael
F. Reynolds

v.

E & C ASSOCIATES, a Rhode Island Limited Partnership, and Lillian Reynolds and Michael Reynolds, the general partners in Sarah J. Salisbury Nursing Centre, A Rhode Island General Partnership.

No. 95–76–Appeal.

Supreme Court of Rhode Island.

April 14, 1997.

Herbert F. DeSimone, Allan M. Shine, Melissa M. Horne, and Diane Finkle, Providence, for Plaintiff.

David M. Campbell, Providence, Philip G. Parsons, Warwick, Roger N. LeBoeuf, Thomas A. Lynch, Providence, for Defendant.

Before WEISBERGER, C.J., and BOURCIER, and FLANDERS, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before the court on an appeal by mechanics' lienholders (lienholders) from a judgment of a justice of the Superior Court which confirmed a closing settlement relative to the sale of the receivership assets and disbursement of sale proceeds. The lienholders are J & D Drywall, Inc.; D.F. Pray, Inc.; R. Moran Associates, Inc.; Ruggieri Bros., Inc.; Acme Tile & Ter-

razzo, Co.; Eagle Cornice Co., Inc.; and Mass. Electric Construction Co., Inc., all of whom were subcontractors that provided services and/or materials in the construction of a nursing-care facility located at 407–455 Douglas Avenue, Providence, Rhode Island (the facility). The Rhode Island Hospital Trust National Bank (the bank) provided construction financing to the Sarah J. Salisbury Nursing Centre (Salisbury). Salisbury was organized as a Rhode Island general partnership consisting of E & C Associates, a limited partnership, Lillian Reynolds, and Michael F. Reynolds, all of whom had varying shares of ownership in the entity.[1] The bank was given a first mortgage on the real estate that would be developed into the facility as well as the pledge of a certificate of deposit owned by Salisbury in the amount of $600,000. We affirm the judgment of the Superior Court in confirming the final settlement. The facts of the case insofar as pertinent to this appeal are as follows.

On October 4, 1990, Lillian and Michael Reynolds, in their capacity as general partners, filed a petition in Providence Superior Court seeking the appointment of a receiver to liquidate the assets of Salisbury and to dissolve Salisbury as a general partnership pursuant to G.L.1956 §§ 7–12–43 and 7–12–48. Pursuant to the petition a justice of that court appointed temporary coreceivers and later, on November 2, 1990, appointed Herbert F. DeSimone, Esquire, and Allan M. Shine, Esquire, as permanent receivers.

The principal asset of the receivership estate was a partially completed nursing home that had been constructed for the benefit of Salisbury. It was apparent to all interested parties that the facility in its uncompleted state was of minimal value. The coreceivers entered upon a vigorous effort to find a purchaser who would complete the facility and pay to the receivers an amount upon completion that would reflect the value of the partially·completed facility. Meanwhile the lienholders had filed the necessary petitions to enforce mechanics' liens and had entered appearances in the receivership proceedings.

After receiving bids from four parties who were interested in purchasing the facility, the receivers recommended, and a justice of the Superior Court approved, a petition to sell the assets of the receivership (the facility) free and clear of liens to Angelo S. Rotella (Rotella). Under the terms of the order entered April 24, 1992, Rotella was to complete construction of the facility with the aid of financing from Continental Wingate Associates, Inc. and mortgage insurance from the United States Department of Housing and Urban Development (HUD).[2] Indeed, the purchase price of the facility was to be the maximum loan amount HUD would guarantee less the cost to complete construction of the facility and the purchaser's legal, financing, and filing fees incurred in consummating the sale. Prior to granting the petition to sell, the coreceivers expressed optimism that if an appropriate mortgage guarantee could be obtained from HUD and the sale consummated, the net proceeds of the sale might be sufficient to satisfy all claims, secured and unsecured. Unfortunately the application to HUD for mortgage insurance was substantially delayed.[3] Meanwhile Rotella applied for a certificate of need (CON) from the Rhode Island Department of Health.

During the interim the bank had provided to the receivers funds to defray the administrative expenses of the receivership since the uncompleted facility provided no source of cash with which to pay for insurance, utilities, and security for the building. As of April 14, 1992, the bank had advanced approximately $100,000 for these purposes. As a result of the delay in the granting of a mortgage guarantee from HUD, the receivers sought permission to extend and modify the purchase-and-sale agreement approved

---

1. The limited partners of E & C Associates were A. Edmond Donatelli, Sr., John C. Donatelli, and A. Edmond Donatelli, Jr.

2. The Superior Court justice's order entered April 24, 1992, incorporated by reference Rotella's March 30, 1992, purchase and sale agreement.

3. The coreceivers assert that the sale of the facility took place approximately seventeen months later than the closing date originally scheduled by the parties.

by the court order of April 24, 1992. The court heard this petition and on February 28, 1994, entered an order extending the closing date for the purchase-and-sale agreement to October 17, 1994. This order contained the following language in paragraph 4 thereof: "the Receivers shall pay HT's [the bank's] claim in full at the closing or within the next two business days thereafter." Notice of the hearing had been given to all interested parties.

Subsequent to the order of February 28, 1994, Rotella obtained a commitment from HUD to guarantee a mortgage in the amount of $11,160,000. This sum was less than the $11,400,000 loan guarantee Rotella had requested and utilized in making his original offer to the coreceivers. A closing was scheduled for September 27, 1994, but was delayed by motions made by certain of the lienholders who sought to enjoin the receivers from disbursing the proceeds of the sale. After a hearing on September 26, 1994, a Superior Court justice (other than the justice who had entered the earlier orders), denied the lienholders' motions. He further denied a motion for reconsideration following a hearing on September 28, 1994.

The closing was held on September 30, 1994. It is undisputed that the gross proceeds of the sale after deduction of construction costs approved by HUD was the sum of $5,868,952. At that time the total claim of the bank for principal and interest exceeded $6,000,000. The bank agreed to pay the receivers the sum of $350,000 for administrative expenses from the amount due under its secured claim. The receivers were also committed to pay to Rotella fees incurred in obtaining the CON from the Department of Health in the amount of $33,400, Rotella's legal fees in the amount of $185,000, additional construction costs necessary to complete the facility as a result of theft and vandalism incurred subsequent to HUD's approval of Rotella's estimate of construction costs in the amount of $237,000, real estate taxes in the amount of $157,617.05, and documentary stamps in the amount of $15,680. The bank agreed that the coreceivers should pay these sums from the proceeds of the sale and further agreed to accept the total sum of $4,800,000 in full satisfaction of its claim. The bank's claim at that point amounted to $5,900,154.96 in principal and interest plus an additional $105,940 in other expenses for which the bank was entitled to reimbursement pursuant to the terms of the promissory note. The settlement with the bank left the sum of $82,000 to apply to the claims of the lienholders and other creditors.

In support of their appeal the lienholders raise a number of issues in separate briefs. These issues may be consolidated for purposes of this opinion into three questions of law and fact.

## I

### Was the Bank's First Mortgage Senior to That of the Lienholders?

■ There is little question that under G.L.1956 § 34–28–25(a)(2) a mechanics' lien "shall be junior to any prior recorded * * * mortgage." Consequently the claims of the lienholders were junior to the mortgage held by the bank. There is also no question that the bank could have foreclosed on the security, cutting off the claims of all other creditors including the lienholders.

■ However, the lienholders argue that the purchase-and-sale agreement which was approved by the order of the Superior Court entered April 24, 1992, contained a clause that read as follows:

"B. Purchaser and Sellers agree that claims filed against the Receivership estate shall be resolved in full, subject to negotiation of unsecured claims, in the event the maximum HUD loan guaranty referred to herein is approved; however, in the event a lesser amount of loan is approved by HUD for a guaranteed loan, those funds necessary to satisfy the unsecured claims shall be apportioned and such apportioned amounts, if any, shall be held in escrow by the Sellers."

In construing this language, the trial justice who had entered the order and had supervised the receivership through its duration construed the word "resolved" as meaning "allowed" rather than "paid." Although another justice of the Superior Court found this language ambiguous, we are of the opinion

that the trial justice's construction of the language was reasonable and correct. At the time of the approval of the purchase-and-sale agreement, the sum of the net proceeds of the sale could not be predicted with accuracy. Nothing in the purchase-and-sale agreement could have deprived the bank of its first mortgage security without its consent. The language of the purchase-and-sale agreement was certainly not sufficiently clear and unambiguous as to deprive the senior security holder of its vested right in the totality of the context in which the purchase-and-sale agreement was entered into and approved.

Any ambiguity that might have been construed from the quoted language would be completely eliminated by the order entered by the same Superior Court justice on February 28, 1994, which extended the closing date for the purchase-and-sale agreement to October 17, 1994. Paragraph 4 of this order reads as follows:

"4. The New Closing Date shall be October 17, 1994; the Receivers, the Buyer and HT may close on an earlier date chosen by mutual agreement among them; the Receivers shall pay HT's claim in full at the closing or within the next two business days thereafter."

It is significant that this order was not appealed even though the record recites that notice was given to all interested parties including the lienholders.

Nothing that took place during the course of these receivership proceedings could properly have been construed as depriving the bank of its senior security position. The argument of the lienholders that they were somehow elevated by the purchase-and-sale agreement into a position equivalent to that of the bank is without merit and must be rejected.

## II

### Was the Bank Entitled to Post-petition Interest on its Promissory Note Secured by a First Mortgage?

■ The lienholders argue that in the circumstances of this receivership the bank was not entitled to obtain interest on its promissory note secured by mortgage after the petition for receivership had been filed. This position is controverted by case law as well as by specific provisions of the Bankruptcy Act.

■ In *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 238–40, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290, 296–97 (1989), the general rule was stated by Mr. Justice Blackmun as follows:

"Section 506, enacted as part of the extensive 1978 revision of the bankruptcy laws, governs the definition and treatment of secured claims, i.e., claims by creditors against the estate that are secured by a lien on property in which the estate has an interest. Subsection (a) of § 506 provides that a claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured. Subsection (b) is concerned specifically with oversecured claims, that is, any claim that is for an amount less than the value of the property securing it. Thus, if a $50,000 claim were secured by a lien on property having a value of $75,000, the claim would be oversecured, provided the trustee's costs of preserving or disposing of the property were less than $25,000. Section 506(b) allows a holder of an oversecured claim to recover, in addition to the prepetition amount of the claim, 'interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.'"

Since the insolvency laws of the State of Rhode Island have been superseded by the enactment of the Bankruptcy Code, this court looks to the Bankruptcy Act and to decisions by the federal courts for guidance in determining priority of claims including those of secured claimants. *Leonard Levin Co. v. Star Jewelry Co.,* 54 R.I. 465, 468, 175 A. 651, 653 (1934). The question raised in *Ron Pair Enterprises, Inc.,* 489 U.S. at 240, 109 S.Ct. at 1030, 103 L.Ed.2d at 297, was whether an oversecured nonconsensual lien by the Internal Revenue Service was entitled to post-petition interest. The Court held that it was. The precode standard had allowed post-petition interest on a secured claim only when the lien on the claim was

consensual in nature. *Id.* at 238, 109 S.Ct. at 1028, 103 L.Ed.2d at 296. In the case at bar, the bank's first mortgage was obviously consensual, therefore it was entitled to post-petition interest under either a precode or a post-code analysis.

Consequently, in light of our determination of the first issue, it is clear that the bank had not consented to any action that reduced its standing as the senior secured creditor. It was therefore entitled to both prepetition and post-petition interest as well as other sums and charges due under the terms of the promissory note. The receivers calculated these sums as exceeding $6,000,000. Since the gross proceeds of the sale were in the sum of $5,868,952, it becomes obvious that the bank was entitled to claim the entire proceeds of the sale to the exclusion of junior lienholders as well as unsecured creditors. Indeed the bank's claim was subject to administrative expenses only to the extent that it benefited therefrom. *South County Sand & Gravel Co. v. Bituminous Pavers Co.,* 108 R.I. 239, 244, 274 A.2d 427, 430 (1971); *see also United States v. Federal Deposit Insurance Corp.,* 899 F.Supp. 50, 55 (D.R.I.1995). The fact that the bank was willing by agreement to accept $4,800,000 in total satisfaction of its senior secured claim did not in any way deprive the junior lienholders of any right to which they could properly claim entitlement.

Even assuming without deciding that the lienholders were not precluded from questioning the confirmation of the closing settlement by failure to appeal the later order entered by the Superior Court on February 28, 1994, we hold that their challenge to the closing settlement and the recognition of the bank's claim to the net proceeds must be rejected.

## III

### Did the Trial Justice Err in Declining to Hold an Evidentiary Hearing on the Coreceivers' Petition to Confirm?

■ The lienholders argue that they should have been given an evidentiary hearing in order to challenge the expenses of the receivership and also certain expenses of the purchaser relating to additional costs caused by vandalism and damage to the facility. Since the trial justice properly determined that the bank's secured claim exceeded the net proceeds of the sale, the lienholders had no standing to object to these expenses since they were approved solely to the detriment of the bank, which had agreed that all such expenses were proper and which had reduced its claim accordingly.

For the reasons stated, the appeal of the lienholders is denied and dismissed. The judgment of the Superior Court in confirming the sale and the disbursement of the proceeds is affirmed. The papers in the case may be remanded to the Superior Court.

LEDERBERG, J., did not participate.