DECISION
Before the Court is a motion brought by Cerce Capital, LLC (Cerce) requesting that Jeffrey Massotti (Massotti) and Peter Cipolla (Cipolla) be held in contempt of the orders which appointed Allan Shine as the Temporary Receiver of Speidel, LLC (Speidel) on June 26, 2009 and Permanent Receiver on July 16, 2009. The Movant, Cerce, alleges that Massotti and Cipolla solicited Speidel customers, interfered with ongoing contracts, and took critical data and information; actions which Cerce argues are prohibited by the orders in the instant matter. Massotti and Cipolla object to Cerce's Motion to Adjudge in Contempt, arguing that there is no evidence that they took any property of Speidel after receiving notice of the receivership. *Page 2 
 I Facts and Travel
Speidel, founded in 1904, was originally operated as a jewelry chain manufacturer in Providence, Rhode Island. Speidel became a watch band distributor and was owned by Frederick N. Levinger. Speidel also owned Providence Watch Hospital, LLC (PWH), a watch repair and sales business with retail shops in Providence, Cranston and Wakefield. Allan M. Shine (the Receiver) was appointed by this Court as Temporary Receiver of Speidel and PWH on June 26, 2009 and Permanent Receiver on July 16, 2009 (collectively, the Orders).[1]
On August 14, 2009, the Court approved an offer by Cerce to purchase all tangible and intangible personal property of Speidel. On September 3, Cerce filed a motion for temporary restraining order against Massotti and Cipolla. Massotti was the former President of Speidel[2] and Cipolla was former Vice President of Marketing. Cerce alleged that Massotti and Cipolla took confidential and proprietary information from Speidel which would provide them with a competitive advantage. When the receivership was filed, Speidel had an exclusive licensing agreement with Timex (Timex Agreement) which was not scheduled to terminate until December 31, 2013. Additionally, Speidel had a product line, "Speidel Express," which was sold by mass market retailers Wal-Mart and Kmart. Speidel products were also sold by mass market retailers Kohl's and Target. Cerce alleges that Massotti and Cipolla took Speidel property relating to these mass market retailers (collectively, the Big Four) including one computer, [3] certain corporate records, Big Four contact information, and folders relating to the *Page 3 
Big Four. The Court issued a temporary restraining order against Massotti and Cipolla on September 3, 2009.
Cerce filed a motion to compel reimbursement and payment of all costs and expenses and included an allegation of contempt of court relating to the Orders. The Court heard testimony over several days and must now resolve whether Massotti and Cipolla should be found in civil contempt.
 II Standard of Review
"The authority to find a party in civil contempt is among the inherent powers of our courts." Now Courier, LLC v. BetterCarrier Corp., 965 A.2d 429, 434 (R.I. 2009) (citingGardiner v. Gardiner, 821 A.2d 229, 232 (R.I. 2003)). The purpose of civil contempt is to "coerce the contemnor into compliance with the court order and to compensate the complaining party for losses sustained." Id. (quoting Biron v.Falardeau, 798 A.2d 379, 382 (R.I. 2002)). A finding of civil contempt, which is within the sound discretion of the trial justice and depends on the circumstances of each case, is based on clear and convincing evidence of a party's lack of substantial compliance with a court order. State v. Lead Industries, Ass'n, Inc.,951 A.2d 428, 464 (R.I. 2008) (citing Durfee v. Ocean StateSteel, Inc., 636 A.2d 698, 704 (R.I. 1994)). The evidence must specifically demonstrate "(1) that the alleged contemnor had notice that he was within the order's ambit, (2) that the order was clear and unambiguous, (3) that the alleged contemnor had the ability to comply, and (4) that the order was indeed violated." U.S. v.Saccoccia, 433 F.3d 19, 27 (1st Cir. 2005) (internal citations and quotations omitted). *Page 4 
 III Discussion
"A civil contempt proceeding is an appropriate vehicle to enforce compliance with court orders and decrees when attempting to preserve and enforce the rights of [the parties]." Nardone v.Ritacco, 936 A.2d 200, 207 (R.I. 2007) (quoting Direct Actionfor Rights and Equality v. Gannon, 819 A.2d 651, 661 (R.I 2003)). Cerce contends that the Court should find Massotti and Cipolla in contempt, arguing that they violated the Orders by interfering and taking the Debtor's assets and confidential information. Massotti and Cipolla claim that their conduct, when measured by the actual terms of the Orders, did not constitute a taking of Speidel's property or the property to which Speidel has a right of possession.
A court may make a finding of civil contempt in order to compel compliance with a court order or to compensate a party harmed by non-compliance of such order. Saccoccia,433 F.3d at 27 (citing McComb v. Jacksonville Paper Co.,336 U.S. 187, 191 (1949)). As discussed supra, determining whether a party has violated an order of the court, so as to support a finding of civil contempt, depends on the circumstances of each case, specifically whether a party had notice of a clear and unambiguous order, and despite an ability to do so, did not comply with its terms. Id.; see alsoProject B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st
Cir. 1991) (combining the related "clear and unambiguous" and violation prongs, to determine whether "the putative contemnor has violated an order that is clear and unambiguous.") Therefore, the Court will first focus on the language of the Orders, and then on the conduct of Massotti and Cipolla
 A The Order
In order for the Court to find the parties Massotti and Cipolla in contempt, the Orders of the Court must be sufficiently clear. It is well-settled that to be enforceable by contempt *Page 5 
proceedings the Orders must "be clear and certain and its terms should be sufficient to enable one reading [it] to learn therefrom what he may or may not do thereunder." Lead Industries, Ass'n,Inc., 951 A.2d at 465 (quoting Ventures ManagementCo. v. Geruso, 434 A.2d 252, 254 (R.I. 1981)). Further, the terms of the order must be "specific, clear and precise so that one need not resort to inference or implications to ascertain his duty or obligation thereunder." Id. Accordingly, an enjoined party "should not be punished for disobedience of an order which is capable of a construction consistent with innocence." VenturesManagement Co., 434 A.2d at 255 (quoting SunbeamCorp. v. Ross-Simons, Inc.,86 R.I. 189, 194, 134 A.2d 160, 162-63 (R.I. 1957)).
The Order appointing the Temporary Receiver states that the "Receiver is authorized to take possession and charge of the property and assets of [Speidel], to collect the debts and property belonging to it and to preserve the same until further Order of this Court." (Ex. 1.) The Order appointing the Permanent Receiver uses similar language, stating that the Receiver "is authorized, empowered and directed to take possession and charge of [the] estate, assets, property and business of [Speidel]." (Ex. 2.) Under the Orders, the designated Receiver is also authorized "to conduct the business of [Speidel]" as he deems appropriate and advisable. Further, with the exact same language, the Orders restrain and enjoin "any creditor, stockholder, corporation, partnership or any other person" from "taking or attempting to take into possession any property in the possession of [Speidel] or of which [Speidel] has the right to possession." Moreover, the Orders prohibit "the cancellation at any time during the Receivership proceeding herein of any insurance policy, lease, or other contract with [Speidel], by any of such parties as aforesaid, other than the Receiver designated. . . ." *Page 6 
A review of the relevant portions of the Orders at issue reveals no ambiguity. The terms are sufficiently "specific, clear, and precise" to put individuals on notice as to what conduct is both prohibited and required. See Lead Industries, Ass'n, Inc.,951 A.2d at 467. Under the express terms of both Orders, any person, other than the Receiver, is prohibited from taking or attempting to take the property of Speidel or the property to which Speidel has legal rights, clearly prohibiting the conversion of receivership estate assets. Further, the Orders clearly establish that only the Receiver is authorized to possess and control the assets of Speidel as well as cancel any of its contracts.
The evidence before the Court reveals that Massotti and Cipolla both received a copy of the Orders in the mail. As indicatedsupra, the Order appointing the Temporary Receiver was issued on June 26 and the Order appointing the Permanent Receiver was issued on July 16. (Exs. 1, 2.) However, beginning June 30 there were several email communications sent by Massotti and Cipolla attempting to enter into new distribution agreements to replace the current agreements held by Speidel. In email communications beginning on June 30, and continuing until July 15, Cipolla approached Continental Holdings Ltd. about entering into a new agreement with Choicelines to distribute the Amore Baci collections, which were then distributed by Speidel. (Ex. 4.) The communications do not simply request a new business relationship, but state that the "current owner of Speidel has walked away from the company and has put it into Receivership here in Rhode Island." (Ex. 4.) According to testimony before the Court, counsel for the Receiver considered the Amore Baci distribution agreement to be an asset of the receivership, and the Receiver never had any discussions in regard to terminating such agreement. (Tr. November 20, 2009 19:4-6, 19-23.) *Page 7 
Similarly, at the time of the receivership, Speidel had an exclusive licensing agreement with Timex which was not scheduled to terminate until December 31, 2013. (Ex. 3.) There is ample evidence before the Court that Massotti began communicating with Timex beginning on July 8 and continuing at least until July 24, regarding Choicelines managing the Timex branded watch business. (Exs. 7, 10, 12, 14, 19, 20.) Specifically, Massotti's "Plan B"[4]
contemplated that Choicelines would transition the Big Four retailers from the Speidel Express brand to the Timex brand. (Ex. 7.) In an email to Timex, which was also sent to Cipolla, Massotti stated that the plan to "takeover the Speidel Express business" had been approved by Wal-Mart, Kohl's, and Target, but discussions at that point were still ongoing with Kmart. (Ex. 10.) The plan involved assigning new SKU numbers to all corresponding Speidel Express SKU numbers, which Massotti acknowledged was a risk because if someone bought the name "Speidel Express" "they [would] have an immediate account." (Ex. 10.) In order to support their plan, Cipolla asked Mr. Ward, another former Speidel employee, to provide him with certain analytical data belonging to Speidel. (Tr. December 18, 2009 65:1-15; Ex. 21.) Cipolla acknowledged at trial that the purpose of getting such information was to create a new file for the transition to Timex. (Tr. December 18, 2009 67: 15-20.)
Further, according to testimony from counsel for the Receiver, Speidel had open purchase orders with manufacturers in China, which the Receiver had never authorized to be diverted, changed or cancelled. (Tr. November 20, 2009 33: 12-20.) However, there is credible evidence that Cipolla approached a manufacturer of Speidel Express watchband parts regarding starting a relationship with Timex. (Ex. 15.) In an email dated July 10, Cipolla stated to a manufacturer in Hong Kong that Timex is "very interested in issuing your factory purchase orders to replace all the purchase orders Speidel issued." (Ex. 15.) Cipolla requested an accurate "Open Order Report *Page 8 
for all Timex and Speidel Express purchase orders Speidel issued" so that Timex could issue new purchase orders for those products. (Ex. 15.) Additionally, on July 22, Cipolla emailed that manufacturer again stating "NO MORE SPEIDEL EXPRESS!!!" and "ALL items in the Speidel Express collection will now be TIMEX." (Ex. 9.)
As discussed supra, the Orders prohibit the cancellation of Speidel contracts and the conversion or attempted conversion of receivership estate assets. "Conversion occurs when a person makes an unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion or inconsistent with the owner's rights." In re Advanced ModularPower Systems, Inc., 413 B.R. 643, 669 (Bankr.S.D.Tex. 2009) (quoting In re Leal,360 B.R. 231, 240-41 (Bankr.S.D.Tex. 2007)). However, "[a] manual taking of the property is not necessary for conversion."Waisath v. Lack's Stores, Inc.,474 S.W.2d 444, 447 (Tex. 1971).
Although Masotti and Cipolla argue that they never took any property of Speidel after receiving notice of the Orders, after considering the previously discussed evidence, the Court finds such argument to be unavailing. Massotti claims that the email to the manufacturer in Hong Kong stating "NO MORE SPEIDEL EXPRESS!!!" was simply a way to clarify to a Chinese supplier that it could no longer use the Speidel Express branding on products sent into the United States, for the Timex program. (Tr. December 18, 2009 42: 5-25.; Ex. 9.) However, the previous email to the same manufacturer requests an accurate open order report for all Timex and Speidel Express purchase orders that Speidel issued in order to "replace all the purchase orders Speidel had issued. . . ." (Ex. 15.) Open purchase orders with this manufacturer were the property of Speidel. The Timex Agreement provided that even if the agreement was *Page 9 
terminated, [5] there were certain sell-off provisions for inventory in the possession or under the control of Speidel. (Ex. 3.)
Further, Massotti and Cipolla used Speidel files in order support their "transition" of Speidel Express to Timex. See
Tr. December 18, 2009 65:1-15; Ex. 21. Certainly, analytical data prepared by Speidel employees containing retail store inventory lists and SKU price ladders constituted property of Speidel.See In re Rekerdres Rekerdres Ins. Agency, Inc., 68 F.3d 467, 1995 WL 581629 (5th Cir. 1995) (finding that customer lists and goodwill of the debtor company constituted assets and therefore, property of the bankruptcy estate). In fact, Cipolla acknowledged that he understood such data and information to be property of Speidel during his deposition. (Tr. December 18, 2009 65:13-15.)
The Court often looks to the Bankruptcy Code and Federal Court interpretations thereof for guidance in receivership matters.See Reynolds v. E C Associates,693 A.2d 278, 281 (R.I. 1997). The Court in In reRekerdres Rekerdres Ins. Agency, Inc. did not focus on an individual's ability to solicit customers of the bankrupt debtor-corporation. 68 F.3d 467, 1995 WL 581629. Rather theRekerdres Court focused on how a shareholder and officer of the debtor corporation began to systematically solicit former customers and acquire former contracts, and found that the defendant had converted the customer lists, expiration lists, and business goodwill of the debtor corporation and funneled them into his new corporation. Id. at *2. Similarly, here the Court finds that Massotti and Cipolla were not simply soliciting new contracts and business for their new, rival company. They were systematically focusing on the manufacturers and *Page 10 
customers of Speidel and attempting to replace, and in effect cancel, current Speidel accounts, contracts, and purchase orders. Accordingly, the Court finds by clear and convincing evidence that Massotti and Cipolla not only had notice of the Orders but also failed to comply with their clear and certain terms. Therefore, the Court finds Massotti and Cipolla in willful civil contempt.
 IV Conclusion
After due consideration of all the evidence, together with the arguments advanced by counsel, the Court finds that former Speidel employees, Massotti and Cipolla, had notice of the Orders which were specific, clear, and precise. Further, the Court finds that despite notice of such Orders, Massotti and Cipolla violated their terms, necessitating a judgment of civil contempt by this Court. If the result were other than as herein set forth, corporate insiders would be allowed to circumvent the receivership process by appropriating for their own benefit the business of the insolvent company, and the power of the Court to preserve and manage receivership assets for the benefit of creditors would be substantially inhibited, and perhaps totally compromised.
[1] The Court approved a motion brought by the Receiver to administratively consolidate the receivership involving PWH with the receivership case involving Speidel.
[2] Massotti bought Speidel in 2002 but subsequently sold it to Frederick N. Levinger.
[3] Subsequent to a demand made by the Receiver, computers were returned to the Receiver by Massotti and Christopher N. Ward. However, Massotti admitted to deleting all communications from the computer after June 26th.
[4] Massotti's "Plan A" was to purchase Speidel before it was placed into receivership, which ultimately did not occur.
[5] According to the Timex Agreement, either party could terminate the Agreement based on the filing of insolvency proceedings but such termination would only be effective sixty days after the terminating party gives notice to the other party. The Court placed Speidel in receivership on June 26, 2009. The emails to the manufacturer in Hong Kong regarding replacing Speidel purchase orders began on July 10. Further, Massotti began communicating with Timex beginning on July 8 and continuing at least until July 24, regarding Choicelines managing the Timex brand watch business. Such communications were certainly within the sixty day time frame specified in the Agreement.